arrears of rent or preceding breach of covenant."
When the defendant constructed the building, it
legally knew that, by the terms of the agreement,
the same would become the property of the plaintiff,
and it also knew that this was one of the considera-
tions upon which it was to have the use and occupa-
tion of the property upon paying the stipulated
monthly rental in money; that, if such cash rental
should be in arrears for ten days, the plaintiff at
her option could terminate the lease; that, when it
was so terminated, the agreement and all rights
thereunder should be at an end and the plaintiff
would be entitled to the property; and that such ter-
mination and possession would be without prejudice
to any remedy which she might otherwise have for
collecting arrears of rent. There is no merit in the
defense. The judgment is affirmed.     AFFIRMED.

McBRIDE, C. J., and BEAN and BENNETT, JJ.,
concur.

---

Argued before Department 2, November 13, 1919, reargued in Banc
March 25, reversed and remanded May 25, 1920.

## HERRICK *v.* BARZEE.

### (190 Pac. 141.)

**Contracts—Attorney may Appear Before Legislative Body to Procure
Appropriation.**

1. A contract for services to be rendered by an attorney before
a legislature, or the Congress of the United States, in securing the
passage of a law providing for the payment of a just claim, is not
unlawful and not against public policy, if it does not contemplate
the use of improper means and if the services to be rendered are
such as appeal to the reason of those whom it is sought to persuade.

**Courts—Federal Decisions Followed in Determining Validity of Con-
tract Affecting Federal Legislation.**

2. In determining whether or not a contract for services to be
rendered by an attorney before the Congress of the United States in

securing the passage of a law is against public policy, decisions of the federal courts should be taken as a guide; federal legislation being concerned.

**Contracts—Advice of Attorney to Petition Legislators Did not Render Contract to Procure Passage of Law Unlawful.**

3. A contract for services to be rendered by an attorney before Congress in securing the passage of a law providing for the payment of a just claim was not rendered unlawful or contrary to public policy because it was attempted to be carried out in part by the claimants writing to the senators and representatives in Congress, upon the advice of the attorney; the United States Constitution securing to the people the right to petition the government for a redress of grievances.

**Contracts—Services of Attorney Under Contract to Procure Legislation Legalized by Provision.**

4. A provision attached to an act of Congress appropriating money to pay claimants, providing that no agent or attorney should receive more than 5 per cent thereof for his services, legalized a contract between the claimants and an attorney agreeing to secure an appropriation to the claimants.

**Attorney and Client—Provision Fixing Compensation Attached to Appropriation to Pay Claim Supersedes Express Contract for Compensation.**

5. Where Congress in appropriating a certain amount to pay certain claimants named in the act attached a proviso to the effect that no attorney representing a claimant should receive more than 5 per cent as compensation, such proviso superseded any express contract between attorney and claimants.

**Trial—Differences in Inferences from Evidence for Jury; Motion for Nonsuit Admits Truth of Evidence; "Demurrer to Evidence."**

6. A motion to nonsuit is a "demurrer to the evidence" and admits the truth of the evidence and every reasonable inference of fact which the jury may infer from it, and, if different conclusions can be drawn from the facts, the case should be left with the jury.

From Multnomah: WILLIAM N. GATENS, Judge.

In Banc.

This is an action to recover $380 for services of plaintiff, as an attorney for the defendant, in prosecuting a claim of the defendant against the United States for $1,900 before Congress and its committees, and securing an act of Congress reimbursing defendant in such sum for the loss of land in the "overlap" in Sherman County, Oregon.

Plaintiff alleges that he entered into a contract with the defendant in 1907, or 1908, to secure an appropriation to reimburse the defendant for the loss of his land, and that he was to receive 20 per cent of the amount collected.

The defendant alleges that he entered into the contract with the plaintiff in 1901, or 1902, and that the money was to be secured by 1907, or the contract then ceased.

The cause was tried before the court and a jury, and at the close of the plaintiff's case in chief, the defendant moved for a judgment of involuntary nonsuit upon the grounds that the contract and the manner of its performance were contrary to public policy, and also for the reason that plaintiff was to receive a contingent commission. The nonsuit was granted and plaintiff appeals.

The original contract was not introduced in evidence. A form of contract, which plaintiff states, was, in substance, the same as the one executed, shows that—

"The defendant employed the plaintiff to prosecute before the Interior Department, the Congress of the United States, and if necessary, the United States Court of Claims, his claim against the Government for damages to him by reason of the opening to settlement of certain lands within the limits of The Dalles Military Road Grant, in the State of Oregon, including damages by reason of the loss of the use of the land and of the improvements for a number of years. In consideration for the said second party's professional services on this claim, the first party agrees to pay said second party the sum of 20 per cent of the amount recovered from the Government."

REVERSED AND REMANDED.

For appellant there was a brief over the names of *Mr. J. B. Ofner* and *Mr. Charles J. Schnabel,* with an oral argument by *Mr. Ofner.*

For respondent there was a brief over the names of *Mr. Andrew M. Crawford* and *Mr. C. L. Barzee,* with an oral argument by *Mr. Crawford.*

BEAN, J.—The defendant contends that the contract in question is a lobbying contract and therefore void. The testimony tended to show the following facts: On May 9, 1896, defendant made a timber and stone entry at The Dalles, Oregon, land office on the S. ½, SW. ¼, Sec. 21, Tp. 1 N., R. 17 E., W. M., in Sherman County, Oregon. The land office records disclosed that the land was subject to entry. The defendant took possession of the tract and made improvements thereon reasonably worth $1,900. Subsequently it was discovered that said land, having been granted to The Dalles Military Road, was not subject to such entry, and on June 11, 1901, Barzee's entry was canceled, as a result of which the latter lost the value of his improvements and was thereby damaged in the sum of $1,900.

It is admitted that the defendant had a just claim against the United States for $1,900; that the plaintiff, Herrick, was employed to prosecute the claim before the proper tribunals for a compensation; that the claim was allowed by Congress on August 11, 1916, and defendant received payment of his claim. There is a conflict in the evidence as to the date of the execution of the contract and also as to the time of its termination and several other matters. In referring to the facts, it is not the intention to express any opinion in regard thereto, but only to

mention those which the testimony tended in a measure to prove.

Plaintiff's evidence indicated that he had been an attorney in Washington, D. C., since 1901; that he continued to serve defendant in the matter from the time the contract of employment was made, about 1909, until after the claim was paid in 1916; that he obtained data in regard to the claim of defendant and 67 other similar claims and prepared two or three different bills which were introduced and passed the United States Senate but failed to pass the House of Representatives; that he worked in the preparation of memoranda used before a committee, and appeared as attorney for claimant before a committee and made argument in favor of the claims before the Interior Department and the General Land Office, to which the bill was referred, and was recognized as attorney for Barzee; that in August 1916, the bill allowing the claims was passed by both branches of Congress, and defendant received the amount of his claim, $1,900. As above stated, we do not pass on the sufficiency of this testimony.

1. The rule of law appears to be that any person whose interests may be in any way affected by any public or private act of a legislative body has an undoubted right to present and urge his claims by arguments, either in person or by counsel professing to act for him, before legislative committees. A contract for services to be rendered by an attorney before the legislature or the Congress of the United States, in securing the passage of a law providing for the payment of a just claim, is not unlawful if it does not contemplate the use of improper means and if the services to be rendered are such as appeal

to the reason of those whom it is sought to persuade. Drafting the petition to set forth the claim, collecting facts, preparing and submitting arguments either orally or in writing to a committee or other proper authority, and other services of like character, are within the category of professional services. They rest on the same principle of ethics as professional services rendered in a court of justice and are no more exceptionable. Services of such nature are separated by a broad line of demarcation from personal solicitation and similar means and appliances: 6 R. C. L., p. 734, § 139; 13 C. J., p. 432, § 368; 15 Am. & Eng. Ency. of Law (2 ed.) 970; *Hyland* v. *Oregon Hassam Paving Co.,* 74 Or. 1–11 (144 Pac. 1160, Ann. Cas. 1016E, 941, L. R. A. 1915C, 823); *Stanton* v. *Embrey,* 93 U. S. 549 (23 L. Ed. 983); *Nutt* v. *Knut,* 200 U. S. 12 (50 L. Ed. 348, 26 Sup. Ct. Rep. 216, see, also, Rose's U. S. Notes).

A valid distinction is made between lobbying services in procuring the passage of legislation and strictly legitimate professional services of an attorney directed to that end, it being held that a contract for contingent compensation for services of the latter kind is legal and enforceable: *Stroemer* v. *Van Orsdel,* 74 Neb. 132 (103 N. W. 1053, 107 N. W. 125, 121 Am. St. Rep. 713, 4 L. R. A. (N. S.) 212); see note, 6 Am. Eng. Ann. Cas. 219; *Chesebrough* v. *Conover,* 140 N. Y. 382 (35 N. E. 633); *Davis* v. *Commonwealth,* 164 Mass. 241 (41 N. E. 292, 30 L. R. A. 743); *McBratney* v. *Chandler,* 22 Kan. 692 (31 Am. Rep. 213).

If Barzee had a just claim against the United States, he had a right to employ an attorney to render proper professional services. The attorney may

receive a compensation consisting of a contingent fee, even where the services are to be performed before Congress. Such a case comes within the well-recognized exceptions to the general rule; *Wright v. Tebbitts,* 91 U. S. 252 (23 L. Ed. 320); *Stanton v. Embrey,* 93 U. S. 549 (23 L. Ed. 983); *Taylor v. Bemiss,* 110 U. S. 42 (28 L. Ed. 64, 3 Sup. Ct. Rep. 441); *Brown* v. *Brown,* 34 Barb. (N. Y.) 533; *Nutt* v. *Knut,* 200 U. S. 12 (50 L. Ed. 348, 26 Sup. Ct. Rep. 216); *McGowan* v. *Parish,* 237 U. S. 285 (59 L. Ed. 955, 35 Sup. Ct. Rep. 543, see, also, Rose's U. S. Notes).

It is stated in 9 Cyc. 483:

"As the habits, opinions, and wants of a people vary with the times so public policy may change with them. * * It is clearly to the interest of the public that persons should not be unnecessarily restricted in their freedom to make their own contracts, and agreements therefore are not to be held void as being contrary to public policy, unless they are clearly contrary to what the legislature or judicial decision has declared to be the public policy, or they manifestly tend to injure the public in some way."

2. The contract in question is not void upon its face. There was some competent testimony that it was a valid, lawful, and enforceable contract. It is identical in all its features with the contract before the Supreme Court of the United States, in the case of *Nutt* v. *Knut,* 200 U. S. 12 (50 L. Ed. 348, 26 Sup. Ct. Rep. 216, see, also, Rose's U. S. Notes), in which a commission amounting to about $20,000 was recovered. As federal legislation is concerned in the present case, we think the cases above referred to before the United States Supreme Court should be taken as our guide.

The act of Congress (39 Stat. 1354), appropriating $94,648.13 to pay the defendant and other claimants named in the act, has attached a proviso as follows:

"Provided, That no agent, attorney, firm of attorneys, or any persons engaged heretofore or hereafter in preparing, presenting, or prosecuting this claim shall, directly or indirectly, receive or retain for such service in preparing, presenting, or prosecuting such claim, or for any act whatsoever in connection therewith an amount greater than five per centum of the amount allowed under this bill to the person for whom he has acted as agent or attorney."

In *Stanton* v. *Embrey*, 93 U. S. 549 (23 L. Ed. 983, see, also, Rose's U. S. Notes), where an attorney's fee for the prosecution of a claim against the United States before the officials of the Treasury Department, the services were rendered upon a contract for a contingent remuneration. The instruction of the trial court to the jury which was approved upon appeal to the Supreme Court of the United States, was in part as follows:

"Where an attorney in the exercise of his ordinary labor and calling, and with the instrumentalities of his professional learning and industry, undertakes to work out a desired result for his client, not through personal influence, but through the instrumentalities of the law—by persuasion; as distinguished from influence—such an undertaking is not an unlawful one, or contrary to public policy."

A judgment for over $9,000 was affirmed.

In 2 R. C. L., page 1041, Section 122, we read:

"In contracts between attorneys and clients the usual test would seem to apply that if a contract can by its terms be performed lawfully, it will be treated as legal, even if performed in an illegal manner; while, on the other hand, a contract entered into with intent to violate the law is illegal, even if the

parties may, in performing it, depart from the contract and keep within the law.''

Public policy and sound morality demands that courts should put the stamp of their disapproval on every act and declare void every contract the ultimate or probable tendency of which would be to affect the integrity or misguide the judgment of those to whom the trust of legislation is confided. All legislators should act from high regard of public duty. Borrowing the language of the Ruling Cases:

''It is not the law that all contracts dependent upon future legislative action are against public policy, nor is it true that all contracts to secure legislative action are unenforceable. It is correct to say that the law guards the processes of legislation against improper influences with jealous care, and will not lend its aid to the enforcement of any contract which expressly or impliedly contemplates the employment of corrupt or otherwise improper methods to influence the official conduct of legislators, or others charged with public duty. But it would be a perversion of this salutary rule to say that it forbids all efforts of interested persons or classes to secure the adoption of desired legislative measures. The courts do not condemn the attempts to secure legislation for legitimate purposes and in a legitimate manner. (Citing *Cole* v. *Brown-Hurley Hardware Co.*, 139 Iowa, 487 (117 N. W. 746, 16 Ann. Cas. 846, and note, 18 L. R. A. (N. S.) 1161, 1661, and note); *Long* v. *Battle Creek*, 39 Mich. 323 (33 Am. Rep. 384); *Stroemer* v. *Van Orsdel*, 74 Neb. 113 (103 N. W. 1053, 107 N. W. 125, 121 Am. St. Rep. 713, and note, 4 L. R. A. (N. S.) 212, and note); *Houlton* v. *Nichol*, 95 Wis. 393 (67 N. W. 715, 57 Am. St. Rep. 928, 33 L. R. A. 166). * * But as the law does not presume that a person intends to violate its provisions, the general principle controlling the construction of a contract to influence legislation when the contract itself does not

in terms stipulate for improper means seems to be that it will be upheld, unless the use of such means appears by necessary implication. The test is, does the contract, by its terms or by necessary implication, require the performance of acts which are of a corrupt character or which have a corrupting tendency?": 6 R. C. L., p. 731, § 137.

The question arises in the present case: Did the services of the attorney require the performance of any corrupt act, or any act which has a corrupt tendency? The terms of the contract do not call for any corrupt or wicked act. In order to portray the tenor of the correspondence between the attorney and United States senators and members of Congress, we produce a portion of the correspondence found in the record as follows: first quoting a letter from Mr. Herrick to Senator Chamberlain.

"December 8, 1909.
"Hon. George E. Chamberlain, U. S. Senate, Washington, D. C.

"My Dear Senator: Referring to my recent interview with your private secretary relative to the claims of settlers in Sherman County, Oregon, I beg to advise as follows:

"All these settlers made homestead entry of what was then supposed to be public land and a large number of them were given patents by the Department upon the theory that the land grant of The Dalles Military Road Company had not attached because the land was situated in the overlapping limits of the Northern Pacific Grant. But in suits in the court, culminating in *Wilcox* v. *Eastern Oregon Land Co.,* 176 U. S. 51 (44 L. Ed. 368, 20 Sup. Ct. Rep. 269), and *Messinger* v. *Eastern Oregon Land Company,* 176 U. S. 58 (44 L. Ed. 370, 20 Sup. Ct. Rep. 271, see, also, Rose's U. S. Notes), it was held that the wagon road grant attached and thereupon the patents to the settlers were set aside and the title to the land confirmed in the Eastern Ore-

gon Land Company. The settlers were dispossessed and either compelled to remove or accept leases under the land company.

"The act of Congress approved February 26, 1904 (33 Stat. 51), directed the Secretary of the Interior to ascertain as to the amount of damages sustained by the various settlers, etc., and accordingly claims were submitted to Special Agent Neuhausen and incorporated by him in a report to the Department which was subsequently referred to Congress. In this connection see, also, Senate Resolution of June 7, 1900, Senate Document No. 8, of the 56th Congress, Second Session, and Doc. No. 240 of the 57th Congress, first session.

"The claims are still pending before Congress unacted upon, and upon behalf of the settlers, a large number of whom I represent, I write to request that you will look into the matter and endeavor to secure favorable action. In view of the investigation and report of the Interior Department it would seem that Congress could appropriate a sum of money to compensate these settlers for the loss of their lands and improvements, or that at the very least the claims could be referred to the Court of Claims under an act of Congress conferring jurisdiction upon that court to determine the amount of damages.

"I should be glad to call upon you personally in regard to the matter or if necessary appear before the Public Lands Committee. But it would seem necessary to introduce a bill at the present session to bring the matter before this Congress.

"Hoping to hear from you and with expressions of esteem,

"I am,

"Very truly yours,"

Together with an answer from the senator:

"United States Senate, Committee on Printing.

"December 9, 1909.

"Samuel Herrick, Esq., Westory Bldg., City.

"My dear Sir: I am in receipt of your favor of the 8th inst. in reference to the claims of the Sher-

man settlers. I will be glad to confer with you in reference to this matter and to take such steps as may assist in having the Government do justice to these men. I can learn better the status of the matter by a talk with you than from statements of the settlers.

"I have the honor to remain,
           "Yours very respectfully,"

Also a letter from Senator Bourne, apparently in answer to the same kind of a letter:

"United States Senate, Committee on Fisheries.
                              "December 10, 1909.
"Mr. Samuel Herrick, Westory Bldg., Washington,
    D. C.

"My dear Sir: I am in receipt of yours of December 8th in regard to claims of settlers in Sherman County, Oregon, in which you informed me that the Secretary of the Interior has made a report upon the claims and that they should now be referred to the Court of Claims. I shall secure and study the Senate documents referred to by you and take such action as may seem best to secure justice for the claimants.
                  "Yours very truly,"

In this correspondence, as well as in the great mass of letters and documents found in the record, we find nothing indicating a corrupt motive, or tending in any way to improperly influence legislation. The senators and representatives from Oregon during the time the matter was pending, nearly all of whom were lawyers of high standing, and all eminent gentlemen of the highest standing and integrity, whose judgment in a matter of ethics in legislation, should not be overlooked or ignored, seem to have viewed the efforts and services of plaintiff as attorney for the claimants as perfectly proper. If any improper conduct had been attempted by the attor-

ney, we believe it would have been shown; and that Congress would not with the sanction of our delegation practically have allowed the attorney 5 per cent of the claims provided for in the act.

Can there be any doubt as to the propriety of the attorney conferring with Senator Chamberlain at the latter's request and informing him of anything in regard to the claims? A conference with any of the federal legislators at the instigation of the attorney would be governed by the same law, for it would not be consistent with duty for an attorney advancing the claim of his client to wait at all times for an invitation before approaching the officials having authority to act in the premises.

3. It is contended by the learned counsel for defendant that the contract is void for the reason it was attempted to be carried out in part by the claimants writing to the senators and representatives in Congress, upon the advice of their attorney.

The Constitution of the United States secures to the people the right to petition the government for a redress of grievances. It may be easy for an advocate to paint such correspondence in a high color and term it "bombarding," but the writer sees no wrong in these settlers in an informal way petitioning their senators and representatives. To deny this right is to deny a constitutional one. Neither did the senators or representatives appear to think there was any impropriety in the claimants so addressing them. If they had the right to lay their matters before congressmen, of necessity it follows that it was proper for the attorney to so advise them of such right. When much of the correspondence took place, apparently the matter had not reached a committee before whom the attorney could appear. Naturally

96 Or.—24

the first effort was to get the matter before a committee. The only way seen by which the contract can be condemned as unlawful is to presume that improper means were intended to be used, which were not stipulated by the contract.

4, 5. As before suggested, the services of the attorney were legalized by the provision above quoted regulating the compensation. Where such legislalation has been enacted, it withdraws from the court the question of reasonable value of such services, and also supersedes an express contract to pay: 6 C. J., p. 753, § 333; *Mullan* v. *Clark,* 4 Idaho, 186 (38 Pac. 247); *Lynch* v. *Pollard,* 26 Tex. Civ. App. 103 (62 S. W. 945); *Ball* v. *Halsell,* 161 U. S. 72 (40 L. Ed. 622, 16 Sup. Ct. Rep. 554, see, also, Rose's U. S. Notes); *Tanner* v. *United States,* 32 Court Claims, 192. It is apparent that the members of Congress directly interested in the passage of the act had cognizance of the efforts of Mr. Herrick, as attorney for the defendant and other claimants, and it was undoubtedly with a view of settling the matter of his compensation that the proviso, above quoted, was incorporated in the law. Plaintiff, according to his claim, was instrumental in procuring the enactment of this law with the proviso. It would seem that he should be satisfied with the result of his labor. There is also testimony indicating that he assented to the condition and waived any compensation in excess of that provided for in the act. It is unnecessary for us to say whether such waiver is within the issues made by the pleadings, as there will be an opportunity to apply to amend the same.

It does not appear as a matter of law that any "lobbying" or any improper methods were resorted to by the attorney or those whom he represented,

or that the same was contemplated. These claimants, who had lost their land and who had a just claim against the United States for compensation therefor, had the right to petition, by letter or otherwise, to their senators and representatives in Congress, and either in person or by their attorney, to present and urge their claims before the proper Congressional committees and before the Department where the bill was referred. It was a purely business transaction. We find no improper means adopted or contemplated in this respect. The case differs, as night from day, from the case of *Sweeney v. McLeod,* 15 Or. 330 (15 Pac. 275). Some of these settlers spent years of the best part of their lives making a home upon the land which they lost, and all appear to have been making an honest effort to obtain compensation therefor through their employed attorney working openly and aboveboard and in so far as we can discover in perfectly legitimate ways.

6. A motion for nonsuit is a demurrer to the evidence and admits the truth of the evidence and every reasonable inference of fact which the jury may infer from it, and, if different conclusions can be drawn from the facts, the case should be left with the jury: *Jackson* v. *Sumpter Valley R. Co.,* 50 Or. 464 (93 Pac. 356); *Peabody* v. *Oregon R. & N. Co.,* 21 Or. 121, 136 (26 Pac. 1053, 12 L. R. A. 823); *Brown* v. *Oregon Lumber Co.,* 24 Or. 317 (33 Pac. 557); *Barr* v. *Rader,* 33 Or. 376 (54 Pac. 210); *Perkins* v. *McCullough,* 36 Or. 147 (59 Pac. 182); *Watts* v. *Spokane, P. & S. Ry. Co.,* 88 Or. 192 (171 Pac. 901).

It was conceded upon the reargument, by counsel for plaintiff, that he was bound by the provision for a commission of 5 per cent on the amount allowed

by the act of Congress. The testimony upon the issues was sufficient to carry the case to the jury and the trial court erred in granting the nonsuit.

It follows that the judgment of the lower court must be reversed and the cause remanded for such further proceedings as may be deemed necessary, not inconsistent herewith. It is so ordered.

REVERSED AND REMANDED.

BENNETT, J., Dissenting.—This is an action brought by the plaintiff, an attorney at Washington, D. C., to recover a contingent fee of 20 per cent of the amount of a claim allowed by Congress to the defendant.

The defendant's claim against the government arose out of an overlap between the grant of land to the Northern Pacific Railroad (forfeited) and the grant to the State of Oregon, afterward transferred to The Dalles Military Road Company, for the construction of a wagon-road from The Dalles to Canyon City, Oregon.

The grant to the Northern Pacific Railroad for a branch line down the Columbia River to Portland, was made in 1864, and gave the Northern Pacific Company the alternate or odd section for 40 miles on each side of the proposed road.

Three years afterward, in 1867, Congress made another grant to the State of Oregon, which was afterward transferred to The Dalles Military Road Company, of a strip three sections in width on each side of a proposed wagon road where the land "had not been otherwise disposed of."

The lands in question, and out of which Barzee's claim arose, were within the limits of both grants.

These lands were at one time withdrawn from set-

tlement by the government, as part of the Northern Pacific land grant. The branch line down the Columbia River, however, was never constructed. On September 29, 1890, Congress forfeited the same and the lands covered thereby were restored to entry.

The Land Department took the view that the lands within the overlap were "disposed of" by the grant to the Northern Pacific Railroad, and therefore did not pass to The Dalles Military Road Company, under its later grant, and that, when the Northern Pacific grant was forfeited, these lands became subject to entry under the homestead and other laws.

This position was contested by the successors of The Dalles Military Road Company, who claimed that no rights had vested in the Northern Pacific Railroad Company at the time of their grant in 1867, and that they therefore took the same. There was a long-continued litigation in relation to the matter, which finally reached the Supreme Court of the United States. While this suit was pending settlers were filing upon the lands in the United States land office, and their filings were being accepted by the government.

Finally, in the case of *Wilcox* v. *Eastern Oregon Land Co.,* 176 U. S. 50 (44 L. Ed. 368, 20 Sup. Ct. Rep. 269, see, also, Rose's U. S. Notes), submitted November 15, 1897, but not decided until January 8, 1900, the Supreme Court held that the map of the general line of the Northern Pacific Railroad Company which had been filed with the department in 1865, did not amount to a definite location, and that, therefore, the land was still subject to disposition by the government at the time of the grant to the State of Oregon in 1867, and passed

by said grant to the State of Oregon and afterward to the Military Road Company and its successors.

In the meantime, Barzee and many other settlers had settled upon their respective tracts and improved the same.

After their filings were canceled, they made the claim that the government should reimburse them for these improvements. In 1904 Congress ordered an investigation of these claims, and T. B. Neuhausen, an agent of the government, was sent out by the department to make such investigation. He made a careful and detailed investigation and filed his report about October 15, 1904, showing the details of each man's claim and the value of the improvements placed upon the land.

Up to this time the plaintiff does not claim to have had anything to do with the matter.

However, in 1908 or 1909, he claims to have made a written contract with these settlers, including the defendant Barzee.

The contract, as claimed by the plaintiff, was substantially as follows:

"The said party of the first part hereby employs the said party of the second part to prosecute before the Interior Department, the Congress of the United States, and if necessary, the United States Court of Claims, his claim against the Government for damages to him by reason of the annulment or cancellation of his patent issued by the Government, covering certain land in the state of Oregon, including damages by reason of the loss of the land and the loss of the improvements. In consideration for the said second party's professional services on this claim, the first party agrees to pay said second party the sum of twenty per cent (20%) of the amount recovered from the Government. Said sum to be due and payable within thirty days after the first party

receives warrant or draft from the Government covering the amount allowed him by Congress or the Court of Claims.

"The second party hereby contracts and agrees to prosecute said claim before Congress, and, if necessary, the Court of Claims, promptly and diligently, and with all reasonable expedition, and without further compensation than the amount specified to be paid him in the first section of this agreement, after the allowance of said claim and the issue of the warrant or draft to the first party."

The terms of this contract were clearly broad enough to cover either legitimate or illegitimate and lobbying services.

Thereafter the plaintiff continued to perform services in the matter of expediting these claims before the different Congresses. Numerous bills were introduced and some of them passed the House and some passed the Senate, but none of them passed both houses and became laws until the 64th Congress in 1916.

Mr. Sinnott, whose home was in the immediate vicinity of these lands, became a member of that Congress and succeeded in obtaining the passage of a bill recompensing some of these settlers, including the defendant, in a sum amounting in the aggregate to about $90,000. This act of Congress contained the following provision:

"Provided; that no agent, attorney, firm of attorneys, or any person engaged heretofore or hereafter in preparing, presenting or prosecuting this claim * * shall receive or retain for * * prosecuting such claim, or for any act whatsoever in connection therewith, an amount greater than five per cent of the amount allowed under this bill, to the person for whom he has acted as such agent or attorney": 64 Congress, Vol. 39, p. 1355.

The services, which plaintiff claims to have performed under the contract, were largely in the nature of personal solicitation of individual congressmen, and the organizing of influence and pressure to be brought to bear upon them in order to induce favorable consideration of the measure allowing the claim. The plaintiff, however, claims to have also appeared before committees and before the department at different times between 1908 and 1916 in an effort to induce favorable consideration.

The cause was tried before the court and a jury, and at the end of plaintiff's case the defendant moved for a nonsuit and dismissal, on the ground that the contract was a lobbying contract, and that the services performed for the plaintiff thereunder, according to his testimony, were lobbying services, for which the plaintiff could not be permitted to recover. The court granted the motion for a nonsuit, and from the order granting the same the plaintiff appeals.

The sole question on this appeal is whether or not, on his own showing, the services rendered by the plaintiff under the contract, or a portion thereof, were of such a nature as to render the contract void, as against public policy and prevent the enforcement of the same.

It seems to be entirely settled that where a party contracts for a contingent fee to secure the passage of a measure in Congress, or any legislative body, and in pursuance of such contract attempts to secure its passage by private solicitation of individual congressmen or legislators, or by bringing influence to bear upon them, the contract is rendered void and will not be enforced by the courts: *Sweeney* v. *McLeod*, 15 Or. 330 (15 Pac. 275); *Hyland* v. *Hassam*

*Paving Co.,* 74 Or. 1 (144 Pac. 1160, Ann. Cas. 1916E, 941, L. R. A. 1915C, 823); *Trist* v. *Child,* 88 U. S. (21 Wall.) 441 (22 L. Ed. 623, see, also, Rose's U. S. Notes); *Clippinger* v. *Hepbaugh,* 5 Watts & S. (Pa.) 315 (40 Am. Dec. 519); *Harris* v. *Roofs,* 10 Barb. (N. Y.) 489; *Rose* v. *Truax,* 21 Barb. (N. Y.) 361; *Marshall* v. *Baltimore & O. R. R. Co.,* 16 How. 314 (14 L. Ed. 953, see, also, Rose's U. S. Notes).

In *Sweeney* v. *McLeod,* 15 Or. 330 (15 Pac. 275), there was a contract for services before the legislature. The court had been asked by the defendant to instruct the jury,

"That if it was the understanding between the plaintiff and defendants that plaintiff should attend at the session of the legislature, and there privately importune, converse with, and persuade members of the legislature in the interests of the defendants, against any measures pending before the legislature, antagonistic to the taking of salmon fish, by means of fish wheels, he cannot recover."

The refusal of this instruction was held error and Mr. Justice STRAHAN, delivering the opinion of the court, said:

"A person may without doubt be employed to conduct an application to the legislature as well as to conduct a suit at law, and may contract for and receive pay for his services in preparing and presenting a petition, or other documents, in collecting evidence, in making a statement or exposition of facts, or in preparing or making an oral or written argument; provided all these are used, or designed to be used, either before the *legislature itself,* or some committee thereof *as a body;* but he cannot with propriety be employed to exert his personal influence, whether it be great or little, *with individual members, or to labor privately in any form with*

*them out of the legislative halls* in favor of or
against any fact or subject of legislation.''

And again, quoting from *Clippinger* v. *Hepbaugh,*
5 Watts & S. (Pa.) 315 (40 Am. Dec. 519):

''It matters not that *nothing improper was done
or expected to be done by the* plaintiff. It is enough
that such is the tendency of the contract that it is
contrary to sound morality and public policy, lead-
ing necessarily, in the hands of designing and cor-
rupt men, to the use of an extraneous, secret influ-
ence over an important branch of the government.''

And again:

''When there is a single contract, and the services
contracted for and rendered are partially those of
an attorney, and partially those of a lobbyist, and
blended together as part and parcel of a single em-
ployment, the entire contract is vitiated. That which
is bad destroys that which is good and they perish
together.''

This opinion is squarely in point. There, as here,
the lobbyist was working to further the honest in-
terests of the defendant before the legislature, and
there was just as much reason to believe the ulti-
mate purpose was a good one, there, as here; and
there, as here, the action of the legislative body was
favorable to the claim advocated. The only differ-
ence is, here the claim of the defendant was affirma-
tive, and there it was negative. There can be no
distinction in that regard, and it seems perfectly
clear that the above case is controlling, unless it is
to be overruled.

In *Hyland* v. *Hassam Paving Co.*, 74 Or. 1 (144
Pac. 1160, Ann. Cas. 1916E, 941, L. R. A. 1915C,
823), there was a contract to pay a commission of 3
per cent on all contracts secured from the city coun-
cil of the City of Portland. The opinion was by Mr.

Justice RAMSEY, who collated the authorities upon the subject at great length, and reached the conclusion that the contract was void, although the contract did not call for any improper services or private solicitation, and there seems to have been no evidence that there was anything of that kind. The court quoted with approval from *Weed* v. *Black*, 9 D. C. (2 MacArthur) 268 (29 Am. Rep. 618), as follows:

"If the terms of the contract be broad enough to cover services of any kind, whether secret or open, honest or dishonest, the law pronounces a ban upon the paper itself. Nor will honest services substantially performed sanctify an unlawful contract."

It is strongly urged on behalf of the plaintiff and appellant, that the same rules do not apply to proceedings before Congress, as before a city council or a state legislature, but there does not seem room for any such a distinction and none seems to be recognized by the authorities.

Indeed, in the case of *Trist* v. *Child*, 88 U. S. (21 Wall.) 441 (22 L. Ed. 623, see, also, Rose's U. S. Notes), already cited from the court of the United States, the contract was almost exactly like the present one and was for services in the matter of presenting a claim against the government, growing out of a treaty; and the matter was presented before Congress in much the same way as was the claim in this case.

The court, after setting forth that an agreement for purely professional services, like drawing petitions and appearing publicly before committees, would be enforceable, said:

"But such services are separated by a broad line of demarcation from personal solicitation, and the

other means and appliances which the correspondence shows were resorted to in this case. There is no reason to believe that they involved anything corrupt or different from what is usually practiced by all paid lobbyists in the prosecution of their business.

"The foundation of a republic is the virtue of its citizens. They are at once sovereigns and subjects. As the foundation is undermined, the structure is weakened. When it is destroyed the fabric must fall. Such is the voice of universal history. I Mont. Sp. L., 17. The theory of our government is, that all public stations are trusts, and that those clothed with them are to be animated in the discharge of their duties solely by considerations of right, justice and the public good. They are never to descend to a lower plane. But there is a correlative duty resting upon the citizen. In his intercourse with those in authority, whether executive or legislative, touching the performance of their functions, he is bound to exhibit truth, frankness and integrity. Any departure from the line of rectitude in such cases, is not only bad in morals, but involves a public wrong. * *

"The agreement in the present case was for the sale of the influence and exertions of the lobby agent to bring about the passage of a law for the payment of a private claim, without reference to its merits, by means which, if not corrupt, were illegitimate, and considered in connection with the pecuniary interest of the agent at stake, contrary to the plainest principles of public policy. No one has a right, in such circumstances, to put himself in a position of temptation to do what is regarded as so pernicious in its character. The law forbids the inchoate step, and puts the seal of its reprobation upon the undertaking.

"If any of the great corporations of the country were to hire adventurers who make market of themselves in this way, to procure the passage of a general law with a view to the promotion of their pri-

vate interests, the moral sense of every right minded man would instinctively denounce the employer and employed as steeped in corruption, and the employment as infamous.

"If the instances were numerous, open and tolerated, they would be regarded as measuring the decay of the public morals and the degeneracy of the times. No prophetic spirit would be needed to foretell the consequences near at hand. The same thing in lesser legislation, if not so prolific of alarming evils, is not less vicious in itself, nor less to be condemned. The vital principle of both is the same. The evils of the latter are of sufficient magnitude to invite the most serious consideration. The prohibition of the law rests upon a solid foundation. A private bill is apt to attract little attention. It involves no great public interest, and usually fails to excite much discussion. Not unfrequently the facts are whispered to those whose duty it is to investigate, vouched for by them, and the passage of the measure is thus secured. If the agent is truthful, and conceals nothing, all is well. If he uses nefarious means with success, the spring head and the stream of legislation are polluted. To legalize the traffic of such service, would open a door at which fraud and falsehood would not fail to enter, and make themselves felt at every accessible point. It would invite their presence and offer them a premium. If the tempted agent be corrupt himself, and disposed to corrupt others, the transition requires but a single step. He has the means in his hands, with every facility and a strong incentive to use them. The widespread suspicion which prevails, and charges openly made and hardly denied, lead to the conclusion that such events are not of rare occurrence. Where the avarice of the agent is inflamed by the hope of a reward contingent upon success, and to be graduated by a percentage upon the amount appropriated, the danger of tampering in its worst form is greatly increased.

"It is by reason of these things that the law is as it is upon the subject. It will not allow either party to be led into temptation where the thing to be guarded against is so deleterious to private morals and so injurious to the public welfare. In expressing these views, we follow the lead of reason and authority.

"We are aware of no case in English or American jurisprudence like the one here under consideration, where the agreement has not been adjudged to be illegal and void. We have said that for professional services in this connection a just compensation may be recovered. But where they are blended and confused with those which are forbidden, the whole is a unit and indivisible. That which is bad destroys that which is good, and they perish together. Services of the latter character, gratuitously rendered, are not unlawful. The absence of motive to wrong is the foundation of the sanction. The tendency to mischief, if not wanting, is greatly lessened. The taint lies in the stipulation for pay. Where that exists, it affects fatally, in all its parts, the entire body of the contract. In all such cases, *potior conditio defendentis.* Where there is turpitude, the law will help neither party.

"The elder agent in this case is represented to have been a lawyer of ability and high character. The appellee is said to be equally worthy. This can make no difference as to the legal principles we have considered, nor in their application to the case in hand. The law is no respecter of persons."

It seems that the principles of law announced by this court in the Sweeney case are not only supported by the vast weight of authority, but they are salutary and should be upheld and enforced, unless we wish to weaken the protection the law has thrown around legislative bodies, and sanction and judicially approve the army of paid lobbyists around our legis-

lative halls, who are already a disgrace and a menace to our institutions.

It will be a sorry day for our government, or for any democratic government, when the courts encourage the employment of such lobbyists working for a contingent recompense, to secure favorable action before a legislative body, by private personal solicitation of the individual members, and bringing to bear the pressure of organized influence upon the legislators.

It will be noted that, in nearly all the cases from which we have quoted, it has been held, that if part of the services rendered under the contract were valid and legitimate, as by the appearance before committees, etc., and part of them were illegitimate and in the nature of personal solicitation and influence, then the whole contract was vitiated and the plaintiff could not recover, at least upon the contract.

It is urged that the dividing line between what is proper and what is improper, should be drawn between "influence" on the one hand and "persuasion" on the other, without regard to the privacy or secrecy of the so-called persuasion. It seems difficult to find much difference between influence and persuasion. The dictionaries give them as synonymous words. To influence is to persuade and to persuade is to influence. Either one may be entirely honest and either may be corrupt. "Influence" may be derived from the most lofty qualities, and money or other bribery, is sometimes very "persuasive." If it is meant by the supposed distinction that, if the efforts of the lobbyist are corrupt and in the nature of bribery, then it is "influence," and, if honest, it is "persuasion," and that private solicitation

for a contingent fee is not unlawful unless actually corrupt, then such a distinction seems to find no single authority to support it, and it is in the face of the opinion in the Sweeney case in which it is said:

"It matters not that nothing improper was done or expected to be done by the plaintiff."

It would be equally in the face of *Trist* v. *Child,* 88 U. S. (21 Wall.) 441 (22 L. Ed. 623, see, also, Rose's U. S. Notes), in the Supreme Court of the United States, where it is said:

"The elder agent in this case is represented to have been a lawyer of ability and high character. The appellee (plaintiff) is said to be equally worthy. This can make no difference."

Indeed, all the authorities unanimously repudiate any claim that there must be any actual attempt at corruption to make a lobbying contract void.

If proof of actual corruption and dishonesty were necessary in any given case, the rule would destroy itself. The mere fact that the solicitation was private and individual would render it so. If the legislator is corrupted, he will not be likely to disclose the fact, and the person who corrupted him will be as little likely to do so. If these contracts were recognized and enforced, it would encourage a great horde of professional lobbyists to hang around the halls of the legislature and of Congress, to bring influence and pressure to bear upon the members whenever large money interests were involved.

The rule inhibiting such contracts is not based upon actual corruption. It is based rather upon the opportunity for corruption; the temptation to corruption; the inducement for corruption. It rests in its insidious character; in its lack of publicity; in the *opportunity for wrongdoing,* which such private

solicitation of the paid lobbyist gives. It is a modified form of the protection which the law throws around the courts, although by no means so complete.

It would not be tolerated for a moment, if a lawyer should go privately to a judge, and solicit thus a favorable decision, or privately argue his case, or arrange with a great number of clients to bring their influence and the influence of their friends to bear upon him, or to organize a system of bombarding him with private letters.

On account of the conditions and necessities of the case, the rule is not entirely so strict as to members of a legislative body. The rule is relaxed, but some of its elements still remain. Some appeals can be made to members of a legislative body, which would not be tolerated as to a judge. But there are still some things, which the law will not countenance or approve even as to legislators. Even the legislator is not always fair game for the lobbyist.

The important elements in determining whether the acts of a paid lobbyist were legal are:

1st. Was his action open and public—as before Congress or a committee—or was it in the nature of a private and secret solicitation of the individual congressman?

2d. Was he acting for a contingent fee?

3d. Did he attempt to organize a pressure to be brought to bear upon members of the legislative body?

If any of these exist, it puts the contract in the doubtful class. If all concur, it is conclusive against the legality of the transaction.

It is true that it has been held by the United States Supreme Court that a contingent fee is not

96 Or.—25

always *conclusive*, against a lobbying contract, and that such a contingent fee may be legal, if it is solely *for work openly performed before a department or a committee.* But all the courts, including that high tribunal, agree that the contingent character of the fee has an important bearing in deciding whether a contract for such services is an unlawful lobbying contract or not: *Trist* v. *Child,* 88 U. S. (21 Wall.) 441 (22 L. Ed. 623, see, also, Rose's U. S. Notes); *Clippinger* v. *Hepbaugh,* 5 Watts & S. (Pa.) 315 (40 Am. Dec. 519); *Richardson* v. *Scotts Bluff,* 59 Neb. 400 (81 N. W. 309, 80 Am. St. Rep. 682, 48 L. R. A. 294); *Bermudez* v. *Critchfield,* 62 Ill. App. 221. The fact of a large contingent fee tends to enhance the temptation and increase the danger, and is therefore one element to be considered.

The only remaining question is, whether or not all or any part of the services performed by the plaintiff in this case come within the prohibited category.

In *Trist* v. *Child,* already quoted from, the ground upon which the contract was held void was a letter written by the attorney to his client, in which he said.

"Please write to your friends to write to any member of Congress. Every vote tells, and a simple request may secure a vote, he not caring anything about it. Get every man you know at work. Even if he knows a page, for a page often gets a vote."

This was held sufficient to show that the contract was a lobbying contract.

In the case at bar the plaintiff, according to his own testimony, was trying to get the measure through by personal solicitation of individual con-

gressmen, and by bringing influence to bear upon them. He says in one place:

"I took the matter up with Senators Bourne, Chamberlain and Lane of Oregon, with Congressman Ellis, Hawley and Sinnott of Oregon, *and with a number of other senators and congressmen* from the different states."

At another place:

"I remember especially conferring with Senator Kittridge of South Dakota and Congressmen Burke and Martin of South Dakota, all of them from my state, and all of them influential members of the national legislature."

At another place:

"When Congressman Sinnott came to Washington I conferred with him about relief for the Sherman County claimants, and both previously and afterwards, *urged all my clients to write him and get his assistance, so I believe he was largely stirred to activity by this correspondence which I had caused to be directed to him.*"

At still another place he says:

"I had various claimants *bombard their senators and congressmen* with letters and also had *their friends in other states write different members of Congress who might be of assistance.*"

And again, at another place, referring to Senators Lane and Chamberlain:

"After having interviewed them jointly on that date *and requested them to use their best efforts in furthering the passage of the relief measure.*"

Another witness called by plaintiff testified:

"Mr. Herrick got in touch and kept in touch with every person *whose influence he deemed might be useful* in securing favorable action by congress on these claims."

If all this did not constitute "lobbying" and the organization and exercise of "influence" upon Congress, then it would seem that we shall have to radically change the accepted meaning of the words.

In short, the endeavors in this case seem to have been of exactly the same nature as those held improper by the Supreme Court of the United States in *Trist* v. *Child,* which decision has never been modified or even doubted and is still the law, as declared by that court.

The case of *Nutt* v. *Knutt,* 200 U. S. 12 (50 L. Ed. 348, 26 Sup. Ct. Rep. 216, see, also, Rose's U. S. Notes), which is strongly relied upon by the plaintiff, does not seem to relate at all to the contention here. There the question of the validity of the contract came up in a suit in equity, and the court below had, of course, to pass upon the facts. The evidence as to whether the plaintiff had made any private or personal solicitations of individual congressmen was in direct conflict, and there was just one witness each way. The plaintiff testified that he had made no such appeal, and the defendant testified that he had. Under these conditions the Mississippi court held that the burden to show such lobbying acts was upon the defendant, and found as a fact that the burden had not been sustained. 83 Miss. 365 (35 South. 686, 102 Am. St. Rep. 452). When the case reached the Supreme Court of the United States, it simply accepted the finding of fact of the court below, without even commenting upon the law, as to this question, at all.

The case of *Stanton* v. *Embrey,* cited by plaintiff from 93 U. S. 549 (23 L. Ed. 983, see, also, Rose's U. S. Notes), was a case where the services were performed before the Treasury Department, and

there was no evidence—not even a claim—that there was any private solicitation or lobbying of any kind.

Neither of these cases modify the rule established in *Trist* v. *Child* in the slightest, but, on the contrary, both cite the latter case with entire approval.

The quotation from 6 R. C. L., § 137, p. 731, which appears in the opinion of Mr. Justice BEAN, should, it seems, be read with Section 138, immediately following, which is as follows:

"The distinction between valid and invalid contracts to further legislation, appears to be that in the former the services or the result thereof are used, or designed to be used, *either before the legislature itself or some committee thereof as a body,* while in the latter a person is employed to exert his personal influence, whether great or little, with individual members, *or to labor privately in any form with them, out of the legislative halls,* in favor of or against any act or subject of legislation. There are, it is true, a few cases holding that personal solicitation of the members of the legislature in behalf of a pending bill, does not render the contract of employment invalid when no deception has been practiced, *but these cases are so opposed to the great weight of authority that they cannot be considered as changing the general rule.* * * As already stated, public policy requires that such a contract should be held void though there is no actual corruption in the particular case. Notwithstanding the fact that the contract does not expressly provide for personal solicitation, it will be declared illegal if it appears that in carrying out the contract it is necessary to resort to "lobbying." It is enough that such is the tendency of the contract."

It is apparent, therefore, that in order to uphold the contract in this particular case, and declare it valid as a matter of law, it would be necessary for us to overrule the decisions of this court in *Sweeney*

v. *McLeod*, 15 Or. 330 (15 Pac. 275), and *Hyland* v. *Hassam Paving Co.*, 74 Or. 1 (144 Pac. 1160, Ann. Cas. 1916E, 941, L. R. A. 1915C, 823), and to disregard the opinion of the Supreme Court of the United States in the Trist case; and the overwhelming weight of authority, as collated by this court in the Hyland case, and by the author of Ruling Case Law as quoted.

It may be that the question as to whether the services were in the nature of influence and private personal solicitation was one of fact for the jury, and in this view the case should be sent back to be submitted to a jury, under proper instructions; but I cannot agree that we should hold as a matter of law that the personal solicitation in this case was not lobbying, or that we should in any way repudiate the doctrine so carefully declared by this court in *Sweeney* v. *McLeod*, 15 Or. 330 (15 Pac. 275).