## Case No. 1,145.

### BAYLY et al. v. LONDON & L. INS. CO.

[4 Ins. Law J. 503.]

Circuit Court, D. Louisiana. 1875.

INSURANCE— CONDITIONS OF POLICY—ACTION—INSTRUCTIONS—EVIDENCE.

[1. Though one of the conditions of a policy on a stock of goods prohibits the storing or vending of saltpetre, on the premises, it is no breach of the condition to keep on hand a small quantity of saltpetre for the sole purpose of curing meat kept in stock.]

[2. In an action on such a policy the defendant pleaded the breach of this condition by the insured, and the court charged the jury that there could be no recovery if they found that the condition was broken by the storing and selling of saltpetre "in any considerable quantity." Held, that the use of the term "considerable" was not objectionable, where the meaning conveyed by the instruction, as a whole, was that there must have been a substantial violation of the condition.]

[3. Furthermore there can be no ground of objection to the use of the term "considerable quantity," where there is evidence that there was on the premises a keg of saltpetre, for that is enough to make the term applicable.]

[4. Where an additional defense, in such action, is that the premises were set on fire by the assured for the purpose of defrauding the insurer, and the court correctly charges as to the measure of proof required to sustain this defense, there is no error in failing to go further, and charge that, this being a civil action, the arson charged need not be proved beyond a reasonable doubt, as it would have to be in criminal proceedings.]

[5. The court cannot grant a new trial, where the evidence is conflicting, merely because the conclusions drawn by the jury from the evidence are different from those at which the court might have arrived.]

[6. Where the jury have assessed the damages at a certain sum in a case properly submitted to them, it is not competent for the court to inquire how they reached the result, if it is warranted by the evidence, or to make their reasons grounds of objection for the purpose of a new trial.]

[At law. Action by G. M. Bayly and Pond against the London & Lancashire Insurance Company. On motion for new trial. Motion denied.]

R. Hunt, T. J. Semmes, R. L. Gibson, J. & E. Austin, for motion.

J. H. Kennard and T. L. Bayne, contra.

WOODS, Circuit Judge. This action was a suit on a policy of insurance to recover for loss declared sustained by plaintiffs on their stock of groceries, by fire, on the 29th of May, 1874. The amount claimed in the petition was $9,195.35, and the jury returned a verdict for $8,714.87.

1. The first ground upon which the motion is based is as follows: That under the express provisions of the policy the plaintiffs were prohibited from keeping in their store, and selling, saltpetre, in any quantities whatever, and the evidence established clearly and beyond doubt that plaintiffs did keep in their store, and sell, saltpetre, in direct violation of their contract. I do not know

that it is denied that the plaintiffs, under the terms of their policy, might keep in their store small quantities of saltpetre, not for sale, but for the purpose of use in preserving from taint meats and other articles which formed a part of their stock. The policy forbids the storing or vending of any of the articles specified as hazardous, of which saltpetre was one. Keeping saltpetre for the purpose just indicated would not be a storing, within the meaning of the policy. Dobson v. Sotheby, 22 E. C. L. 481; O'Niel v. Buffalo Fire Ins. Co., 3 Comst. [3 N. Y.] 127. The plaintiffs do not deny that a part of a keg of saltpetre, which was used for the purpose above stated, was upon their premises at the time of the fire. But does the proof establish clearly and beyond doubt that the plaintiffs kept saltpetre for sale?

The proof upon this point is confined to the evidence of two witnesses, Van Benthuysen and Pond, the latter being one of the plaintiffs. Van Benthuysen testifies that, as to the charge that the plaintiffs kept saltpetre in store upon their premises, there was nothing in it. Pond, in an ex parte statement under oath, taken by an agent of the North British & Mercantile Insurance Company, in answer to the question put to him by the agent, "Did you keep in store and for sale coal oil, saltpetre, powder, matches, and other goods of like character?" answered: "We kept saltpetre in small quantities; no powder; matches in small lots, and coal oil in cases." When on the stand as a witness in the case, Pond testified that they had in their store part of a keg of saltpetre, for use in preserving meats, but not for sale. This was all the evidence upon this point. It cannot be denied that there was evidence on both sides the question, whether saltpetre was kept in store for sale on the premises. When this is the case it is the province of the jury to decide upon the weight and credibility of the evidence, and the court, even should it disagree with the jury on these points, would not set aside the verdict of the jury for that reason. To do so would be to invade the premises of the jury. Ashley v. Ashley, 2 Strange, 1142; Swain v. Hall, 3 Wils. 45; Lewis v. Peake, 7 Taunt. 153; Hartwright v. Badham, 11 Price, 383; Carstairs v. Stein, 4 Maule & S. 192; Woodward v. Paine, 15 Johns. 493. The jury are the exclusive judges of the weight of evidence. Ewing v. Burnet, 11 Pet. [36 U. S.] 41; U. S. v. Laub, 12 Pet. [37 U. S.] 1; Richardson v. Boston, 19 How. [60 U. S.] 263; Hyde v. Stone, 20 How. [61 U. S.] 170. As the question was first submitted to the jury, and they have passed upon it, and there was evidence to sustain their finding, the issue is not open for the consideration of the court. I therefore am of the opinion that the first ground for the motion is not well taken.

2. But it is insisted by defendants that there was an error in the charge of the court, to their prejudice upon defense set up, that the plaintiffs stored and sold saltpetre on the premises, contrary to the terms of the policy.

The charge of the court upon this point was as follows: "It is claimed by defendants that the plaintiffs kept and sold upon the premises, where the insured goods were stored, saltpetre, and that this by the very terms of the policy avoided the contract of insurance. On this point the policy provides as follows: 'And it is decreed and declared to be the true intent and meaning of the parties hereto, that in case the above mentioned property, or premises, or any part thereof. shall at any time after the making and during the continuance of this insurance be appropriated. applied or used to or for the purpose of storing or vending therein any of the articles, goods or merchandise in the conditions aforesaid denominated hazardous, extra hazardous, or included in the memorandum of special rates, unless herein otherwise specially provided for or hereafter agreed to by this company in writing, and added to or indorsed upon this policy, then and from thenceforth so long as the same shall be appropriated, applied or used, these presents shall cease, and be of no force or effect.' By a reference to condition 3, indorsed upon the policy, the article of saltpetre is found to be classed as extra hazardous. Upon this branch of the case I instruct you that insurance companies are not compelled by their employment to take risks except upon their own terms. They have the right to impose such conditions, not contrary to good morals, or public policy, as they may choose, and these conditions are binding upon the parties assenting to them. When it (an insurance company) says it will, not insure premises containing gunpowder or saltpetre, and inserts a condition in its policy that if gunpowder or saltpetre is stored or sold on the premises, the policy shall be void, that provision is binding on the assured; and if he stores and sells upon the premises these articles, that fact avoids the policy. And in case of loss by fire, it makes no difference that the loss was not occasioned by the prohibited articles. The assured is bound by the terms of the contract, and the insurer has a right to stand upon the provisions of his contract. So if you find, from an inspection of the policy, that it was to be void and of no effect if saltpetre was stored and sold on the premises, and saltpetre was stored and sold on the premises in any considerable quantities without the assent of the assured, these facts avoid the policy, and there can be no recovery."

The criticism made by the defendants on this charge is confined to the use of the word "considerable," in the last clause. But taking the entire charge upon this subject into consideration, it seems to me there is no error in it, and the word objected to could not mislead the jury. The meaning intended to be conveyed, and it seems to me

actually conveyed, is that there must be a substantial violation of the terms of the policy. To say that the storing of saltpetre in any quantity, however minute, would avoid the policy, would not be true. The storing or selling of half a pound of saltpetre would not avoid the policy; and it would not be a fair construction of the policy to so hold. The word "considerable," was therefore used as a qualifying word. The proposition submitted to the jury was that the storing or selling of saltpetre on the premises would avoid the policy; but there must be such a quantity as in the fair construction of the policy and intent of the parties would fall within its prohibition and amount to a substantial violation of the conditions of the policy. But a charge cannot be fairly considered or construed disconnected from the evidence to which it applies.

I have already referred to the evidence in this branch of the case, but must do so again. Van Benthuysen testified that no saltpetre was stored on the premises. Pond testified on the stand that part of a keg was kept on the premises for use in preserving meats. This, as we have already seen, was not a "storing," within the meaning of the policy. Now, if this had been the only evidence in the case upon this point, the defendants would have had no ground of complaint, for this charge would have been abstract, there being no testimony to show a storing or selling, to which the charge could apply. The plaintiffs might have complained, but the defendants could not. The only other evidence on this point in the case was the affidavit of Pond, already referred to, taken by the insurance agent and offered as an admission of one of the plaintiffs. Here are the questions and answers: "Q.—Did you keep in store and for sale coal oil, saltpetre, powder, matches, and other goods of like character? A.—We kept saltpetre in small quantities; no powder; matches in small lots, and coal oil in cans. Q.—Give an estimate of the quantities of these goods on hand at any one time. A.—We had at the time of the fire only five cases of matches, one keg of saltpetre and five or ten cases of coal oil."

Now, what is the effect of this evidence? Unquestionably, that matches, saltpetre and coal oil were kept on hand and for sale in substantial and considerable quantities. The plaintiffs are shown to be wholesale dealers, and that at the time of the fire they had a keg of saltpetre on hand for sale. Can any man say that it was not a considerable quantity? Now, what was the charge of the court as applied to this evidence? It was that if the plaintiffs stored or sold saltpetre in any considerable quantities, they violated the condition of their policy, and could not recover. What is there here of which defendants could complain? Where was the error of this charge, as applied to this evidence, and what was there in it to mislead

the jury? In my judgment, there is no good ground of complaint against this part of the charge, either considered as an abstract proposition or as applied to the facts of the case.

3. It is stated as a ground for a new trial that one of the defenses being that the premises where the insured goods were stored was set fire to by the plaintiffs for the purpose of defrauding the defendants, the court did not charge the jury that, this being a civil action, the rule of evidence in criminal cases did not apply, and that it was not necessary to sustain the defence to establish beyond a reasonable doubt the fact that plaintiffs had fired their own premises.

What the court did say to the jury was as follows: "The defendant alleges that the fire in the premises, by which the plaintiffs allege their goods and stock in trade were lost and damaged, was caused willfully and maliciously by the plaintiffs, or others with their knowledge or connivance, and with intention of defrauding the defendant. It needs no judge to tell you that if these facts are established there ought not to be and cannot be any recovery on their policy. The burden of proof is on defendant to establish this branch of defense. The presumption of law is against the commission by plaintiffs of so great a crime, and to make out this defense the proof offered by defendants must be clear and satisfactory to your minds. You must be convinced from the evidence either that plaintiffs set fire to the premises, or that it was done by their procurement or connivance. Even if the evidence should convince you that the fire was set by the employees of the plaintiffs, that fact would not make good this branch of the defense, unless you were also clearly convinced that the fire was set by the direction, connivance or consent of the plaintiffs. The purpose of fire insurance is to indemnify the insured against incendiary as well as accidental fires, when the insured is in no way or manner chargeable with the fire. If you shall find that this defense is established by the proof, that will bring your deliberations to a close, and your duty will be to return a verdict for the defendants. But, if you should be of opinion that this defense is not proven, it will then be your duty to consider other matters of defense relied on." No objection is made to this charge as given, but it is said that the jury should have been told that it was not necessary to establish the firing of the building by the plaintiffs with the same strength and clearness of proof as required in criminal cases. In my opinion, it is usually sufficient to state to the jury what rules of evidence do apply, without stating also the rules which do not apply. I do not think it possible that the jury could have misunderstood the charge on this branch of the case, and I have not the slightest reason to believe they were misled. A labored and ingenious argument was submitted to the court in or-

der to induce it to grant the motion for a new trial, to show that Bayly & Pond did in fact fire their own premises. It would be sufficient to say, in answer to the argument referred to, that substantially the same argument was made to the jury, and failed to convince them of the truth of the charge made. Even were I convinced that the proof sustained the charge, it would not be my province to set aside the verdict of the jury because I disagreed with them. But as the argument was pressed with great vigor upon the attention of the court, it is not improper for me to say that it failed to convince me, as it had already failed to convince the jury.

The fire was first discovered about 9 o'clock p. m., of the 29th of May, 1874. The theory of the defendants is that it was set by two employees of the plaintiffs. This theory is not sustained by one word of direct evidence; the defendants depend on circumstances, only, to establish it. These circumstances were, as the evidence shows, that it was the custom of the plaintiffs to close their stores for the day at about 6 p. m., and to warn the employees upon the premises that they were about to close by the ringing of a bell or gong. On the afternoon of the day upon which the fire occurred these employees, as they claimed, did not hear the bell ring, when their business called them to the third story, and were locked up in the stores. When they discovered the fact, which was not till later than half past 6, they descended to the ground floor, and finding themselves locked in they returned to the second story, got out upon the roof of the gallery, which extended over the pavement, and slid down one of the iron columns to the street. When the fire on the premises was discovered, about 9 o'clock that evening, the testimony tends to show that it was burning in three different places. The defendants claim that these employees, before they left the building, had laid and fired the match that about two hours subsequently fired the building. This theory strikes me as highly improbable. Both these men were examined as witnesses, and they appeared to be of ordinary intelligence. It certainly seems plain that no one, unless insane, having fired a building, after it was closed for the day for the purpose of fraud, would have left it in broad daylight, with the sun an hour high, and left it too in the most conspicuous manner, and upon the most frequented thoroughfare in this city. If the claim of the defendants is true, these men had, by the laws of Louisiana, been guilty of a capital offense, and they take pains to advertise the fact by leaving the scene of their crime in a manner calculated to excite the attention and surprise of all the passers-by upon the most crowded street of the city. Men who commit the crime of arson do not proceed in that way when they can just as easily protect themselves by secrecy and darkness.

In my judgment there is not only an utter failure of direct proof to implicate these men, but there are the most cogent probabilities against the truth of the charge laid at their doors. But suppose it were established that the two employees of the plaintiffs fired the building. That is not sufficient; for there must be proof that they acted by the procurement or connivance of the plaintiffs. Upon this point there is not one word of proof. An attempt was made, by proving the business embarrassments of the plaintiffs, to show a motive for burning their own premises and thereby securing the insurance money. But in my judgment the decided weight of the evidence was that plaintiffs were not embarrassed; and the proof is uncontradicted that if their insurance money had been promptly paid, nevertheless their loss by the fire, over and above their insurance, would have been a very large amount—Pond himself placing it at $100,000. . The fact which defendants essayed to prove, that the buildings were fired purposely, by showing that the fire, when discovered, was burning in three places, does not prove or tend to prove that plaintiffs caused the fire to be set. There are incendiary fires which are not set by the owners of the premises. Buildings are often fired by incendiaries from motives of revenge, from hope of plunder, or for the wanton purpose of simply causing a great fire and making a great excitement.

It were easy for any one so evilly disposed, with false keys or by other means, to gain access to the premises and set them on fire. Whoever did it waited till after dark, and left the building in as secret and unsuspicious a manner as possible. My deliberate conviction is, therefore, that this branch of the defense had nothing to support it, and I entirely agree with the jury in the conclusion they must have reached upon it.

4. It is assigned as other grounds for a new trial that the plaintiffs, by false and fraudulent statements, tried to exaggerate their loss, and that the proof of the amount of loss was uncertain and unsatisfactory. The questions of the fraudulent practices and of the actual amount of their loss were fairly submitted to the jury. There was evidence to sustain the verdict of the jury, and their finding is conclusive.

5. It is insisted that the jury must have arrived at the amount of their verdict by allowing the plaintiffs' claim for profits resulting from illegally carrying on the business of rectifiers. In answer to this it may be said that the jury report a given sum as the amount of the loss. We do not know how they arrived at that result, and we cannot ascertain, nor is it competent for us to inquire. One juryman has herein used one method of calculation, and another another. We have no right to enter into their deliberations, and make their reasons or their methods a ground of objection, if they have reached a substantially just result. But it seems to me that, even if the plaintiffs had

made large profits by an illegal traffic, it could not be said that they insured for illegal profits. They lost no "profits" by the fire, and they make no claim for "profits." The question of profits only came into the case as a factor in the problem to be solved, namely: How many goods were left in the store at the date of the fire, and what. therefore, was the actual loss, not of profit, but of property?

Lastly, it is said that by the process carried on in the premises of plaintiffs of reducing liquors by the mixing of water and the making of cocktails, etc., the risk was increased, and therefore there should have been no recovery. The proof upon this point was not so clear as to satisfy my mind that, as a question of law, the risk was increased. The high-proof spirits were passed into tubs and diluted with water. There was no fire or light in that part of the building, and smoking was prohibited anywhere in the premises. I am not able to say, as a question of law, that risks were by these precautions increased, and I was not asked to say so to the jury. I do not think a new trial should be granted for this last reason assigned.

I believe I have noticed all the matters stated in writing or orally upon the argument as reasons why a new trial should be granted, and am satisfied that none of them are well taken. The case was laboriously and ably tried by counsel for the parties. The jury was one of exceptional intelligence and experience in affairs, and in my judgment their verdict rendered substantial justice between the parties. The motion for a new trial must be overruled.