Argued February 1, affirmed April 4, rehearing denied July 18,
1922.

# FARRIN *v.* STATE INDUSTRIAL ACCIDENT COMMISSION.

## (205 Pac. 984.)

**Trial—Involuntary Nonsuit Should be Denied if Any Evidence Tends to Prove Case, and References must be Made in Favor of Plaintiff.**

1. A motion for an involuntary nonsuit should not be granted where any evidence is produced by plaintiff tending to uphold his right to recovery, and in considering the evidence every fair and legitimate inference which can arise must be made in favor of plaintiff.

**Master and Servant—Verdict in Compensation Case Conclusive.**

2. Under Workmen's Compensation Act (Section 6617, Or. L.), a verdict of a jury trying questions of fact on appeal from a decision of the State Industrial Accident Commission is binding on the Supreme Court if sustained by some evidence, however slight.

**Master and Servant—Employment Within Compensation Act Held Question for Jury.**

3. Evidence adduced on a trial on appeal from a decision of the State Industrial Commission *held* to present a question for the jury as to whether one of a crew of four men operating a small sawmill cutting his logs was an employee of the mill owners within Workmen's Compensation Act (Section 6619, Or. L.).

**Master and Servant—Sawmill Worker Held Engaged in "Hazardous Occupation," and not in "Farming," Within Compensation Act.**

4. The operation of a small sawmill by a farmer cutting lumber for the purpose of constructing a dwelling-house *held* neither "farming" nor work incidental to "farming," classified as a nonhazardous occupation by Workmen's Compensation Act (Sections 6618, 6619, Or. L.), and a workman employed in the mill was engaged in a "hazardous occupation" within the statute, regardless of the location, ownership or size of the mill, and however brief his employment.

**Coroners—Officer Powerless to Determine Status of Deceased as Employee.**

5. Coroner whose duties are defined by Sections 1070–1073, and Sections 1835–1851, Or. L., is powerless to determine the status of the deceased person as an employee within the workmen's compensation law.

---

4. What constitutes extrahazardous employment and other occupations expressly included within the meaning of Workmen's Compensation Acts, see notes in **Ann. Cas.** 1917D, 4, 33, 38, 39, 42; **L. R. A.** 1916A, 217; **L. R. A.** 1917D, 152; **L. R. A.** 1918F, 230.

Master and Servant—Method of Paying Wages No Bar to Compensation.

6.  Neither the method of paying wages nor the fact that no pay-roll is kept is a bar to compensation under the Workmen's Compensation Act.

From Multnomah: JOHN McCOURT, Judge.

Department 2.

This is an appeal from ·a judgment obtained by Viroqua Farrin, plaintiff, against the State Industrial Accident Commission, and J. W. Ferguson, Will T. Kirk and William A. Marshall, Commissioners, defendants, on account of the accidental killing of Jesse G. Farrin, her husband.

Parmele & Sons were the owners of a small sawmill situate on Siletz Bay, Lincoln County, Oregon. This mill contained, among other machinery, a boiler, which exploded on November 21, 1919, instantly killing Farrin. The plaintiff asserts that at the time of the accident the relationship of employer and employee existed between the owners and operators of the sawmill and Jesse G. Farrin, her husband. Thereafter plaintiff filed her claim, under · the provisions of the Workmen's Compensation Act, for compensation for herself as widow, and for her dependent infant child.

This case has hinged to a great extent upon the testimony of Edgar C. Parmele, one of the alleged employers. The investigator for the commission, in his report bearing date November 8, 1920, said, in relation to Parmele:

"I am not highly impressed with his sincerity or his sense of justice to 'the other fellow' when his own interests are at stake."

He also wrote that:

"Mr. Parmele stated in the course of our talk that they had sawed logs for other parties prior to the

time of the explosion, and where they furnished all the labor and did all the work in connection with the sawing they charged $8 per thousand feet."

The following is an excerpt from a report of the investigator dated at Toledo, Oregon, November, 6, 1920:

"In view of the fact that Parmeles charged $8 per thousand when they did all the work of sawing and handling the lumber themselves, and $6 per thousand under the arrangement with Farrin, it might be considered that they were paying him $2 per thousand for his labor. Parmele being the owner of the mill, Farrin could not have worked there without their consent."

As a result of an investigation conducted by the commission, it found:

"That G. S. Parmele & Son owned a small sawmill near Taft, Oregon, and made a practice of sawing logs in small lots for various residents of that community.

"That Jesse G. Farrin, with the approval of Parmele & Son, arranged with one Alinger, who also desired to have some logs cut into lumber, to exchange labor with him, under which arrangement both Farrin and Alinger were to work in the mill while Alinger's logs were being cut and while Farrin's logs were being cut. * *

"That the relationship of employer and employee under the provisions of the workmen's compensation law, did not exist between Parmele & Son and Jesse G. Farrin at the time of the explosion of said boiler."

The claim was rejected by the commission.

Claimant thereupon appealed to the Circuit Court of the State of Oregon in and for Multnomah County. Trial was had, at which the following testimony was adduced:

Viroqua Farrin testified that her husband started to work in the sawmill on the morning of November 20, 1919; that he worked that day, went back to work on the morning of the next day, and worked until the explosion occurred; that about 4 o'clock she was told of the accident wherein he was killed, which had happened about 2 or 3 o'clock that afternoon.

Edgar C. Parmele testified:

"Q. Had you rejected the Compensation Act at the time?

"A. No, sir. * *

"Q. When did the mill start up?

"A. On the twentieth day of November, 1919. * *

"Q. Did he [Farrin] have anything to do with the operation of the mill?

"A. Well, he trimmed his lumber off with a slab saw and I think he helped pull the cable up a few times to tie on the logs. * *

"Q. And who took care of the saw?

"A. My brother.

"Q. Who run the engine?

"A. My father.

"Q. How many men were handling the operation of the logs from the river to the saw and past the saw?

"A. Well, there would be three with Farrin helping pulling the cable.

"Q. Farrin was helping to do that every time they pulled the logs out?

"A. Yes, sir. * *

"A Juror: How many different things did you see this Mr. Farrin perform on the day you were at the mill? * *

"A. The first thing would be to help pull the lines down to the river and pull the log out of the river. * *

"Q. Then after the log was through with the saw, through the large saw off the carriage, they would turn it over to him to do as he pleased?

"A. Yes, sir. * *

"Q. Mr. Parmele, who was in charge of the operations there at this mill?

"A. Of course it is customary for the head sawyer to operate it.

"Q. And who was the head sawyer?

"A. My brother.

"Q. He was in charge of the operations there at that time?

"A. Yes. * *

"Q. The day before the explosion Mr. Farrin worked there, as I understand it, all day?

"A. Yes, sir.

"Q. And you worked there all day?

"A. Yes, sir.

"Q. What was the agreement as to how long Mr. Farrin should work there?

"A. Of course he was to work until his lumber was out. * *

"Q. I ask you whether at the time of the explosion they had finished getting the lumber out.

"A. No, sir. * *

"Q. There was still some to cut?

"A. Yes, sir. * *

"Q. Do you know what act they had been engaged in just before the explosion, did you see from the condition of the log and the cable what they had been undertaking to do just before the explosion?

"A. The cable was on the log and the log headed in the chute. * *

"Q. You said the log was halfway up the chute?

"A. No, just headed in the chute. * *

"Q. Had the cable been fastened on to it?

"A. Yes, sir.

"Cross-examination.

"Q. Whose lumber had you been sawing just prior to that?

"A. Langer's logs, I believe, but they had put the cable on one of Farrin's logs. * * Langer and Farrin each had logs and they had just finished one of Langer's logs and put the cable on one of Farrin's. * * Along in the early part of the summer, I think,

he [Farrin] came to us and wanted to know if he would bring some logs if we would saw them for him, and I told him that we would but he would have to be there and take the lumber as it came from the big saws. The reason for this was the men were saying we were giving them lumber that didn't come out of their logs. * * We said we would be short of help and wanted to know if he could not bring another man with him and he said he would try. He didn't get him. * *

"Redirect examination.

"Q. Mr. Farrin did other work in the mill besides just taking the lumber away from the saw?

"A. Helped pull the cable down, yes, sir, and cut the slabs and trimmed his lumber.

"Q. Worked around the mill in general?

"A. Yes. * *

"A Juror: How long does it take to cut a thousand?

"A. If the mill was running like it ought to we would cut on an average of about 5,000 feet a day. * * The mill had been standing still and we had lots of belt trouble, etc. We didn't get much done.

"The Court: The only people you had work in there outside of Mr. Farrin and Mr. Langer were your father and your brother?

"A. And my mother was there.

"Q. She did not do any part of the operating there of the mill, did she?

"A. She helped my father fire. * *

"Q. Now, supposing Mr. Langer and Mr. Farrin had not been there. Would the operation of cutting this lumber as you had undertaken it, been carried on?

"A. No, sir.

"Q. It required those two men, or at least one of them, there to perform that operation?

"A. Yes, sir. * *

"Q. He [Farrin] had been down to attach the dogs to the logs?

"A. Yes, sir. * *

"Q. As a matter of fact, the day you worked there, Mr. Farrin did other work besides taking away the lumber out in the creek?

"A. Yes. * *

"Q. To work around various places in the mill, and on the day you were gone of course you don't know where he worked, but there was nobody else to do the carriage work, was there?

"A. No, sir.

"Q. And he arrived there in the morning when the mill started up on the day you started, didn't he?

"A. Yes, sir.

"Q. He was ready for work when the mill started?

"A. Yes, sir.

"Q. And he stayed with it until the mill shut down that night?

"A. Yes, sir. * *

"The Court: Just what was the conversation that you had with Mr. Farrin on the 19th concerning the matter of being shorthanded and needing help?

"A. Well, about the time he started away, why, we said that there was not many of us and we needed more help, asked him if he couldn't bring another man with him, and he said he would try, but he didn't get any man. He came alone. * *

"Q. Who would this other man be helping if he got one?

"A. I don't know just where we would have him work * * but I suppose we would pay him.

"Q. What did you have in mind that the other man would do that he would bring?

"A. Well, there was lots of things a fellow could do around the mill.

"Q. Such as pulling the cable on the logs?

"A. Yes, something of the sort.

"Q. And assisting in getting a log on in front of the saw, on the saw table?

"A. Anything of that nature.

"Q. You really required someone to render the service that Mr. Farrin was rendering the day before?

"A. Yes, sir.

"Q. And on the next day you not only required that same service but you required the service you had been rendering the day previously?

"A. Well, of course, when I was there I helped put the log on the carriage.

"Q. I know, but when you were gone the next day.

"A. When I was gone the next day of course there was no one to help. My brother would have had to do it all if Mr. Farrin had not volunteered. * *

"A Juror: Did you intend to employ a man that Mr. Farrin would bring as your employee to do some job, perhaps bring the logs out of the water, or what not, * * was that your intention when you asked him for an extra man?

"A. I think so; yes, sir.

"Q. You would employ that man?

"A. Yes, sir.

"The Court: Did the fact that Mr. Farrin was around there have anything to do with your doing the work for $6 instead of $8?

"A. Of course, we would have had to pile the lumber, of course it was more work than without his help."

A verdict was returned for the plaintiff, together with a special verdict in which the jury found that "at the time of his death Jesse G. Farrin, the deceased, was an employee of Parmele & Sons."

Among the findings of the court, we set out the following:

" * * And the evidence and the verdicts of the jury being now before the court, and all the evidence adduced at the trial of said action being before the court, and based upon the files, records, evidence and findings herein, all of which are hereby referred to and made a part hereof, this court does make the following findings, to wit:

" * * That said deceased, Jesse Farrin, on the twentieth day of November, 1919, started to work in the sawmill near Taft, Oregon, owned and operated

by Parmele & Sons, and continued to work in and about said sawmill until about 2 o'clock P. M. of November 21, 1919, at which time the boiler located in said mill exploded, causing the instant death of said deceased, Jesse Farrin; that at the time of said explosion and at the time of his said death, Jesse Farrin was an employee of said Parmele & Sons and was engaged in hazardous employment and lost his life while in the course of his employment and while performing his duties as a workman and employee."

Thereafter, on the seventh day of July, 1921, the court rendered judgment in favor of the plaintiff and against the defendant, from which the commission appeals, assigning error of the court in overruling defendant's motion for nonsuit.

AFFIRMED.    REHEARING DENIED.

For appellant there was a brief over the name of *Mr. I. H. Van Winkle,* Attorney General, with an oral argument by *Mr. James West,* Assistant Attorney General.

For respondent there was a brief over the name of *Messrs. Senn, Ekwall & Recken,* with an oral argument by *Mr. F. S. Senn.*

BROWN, J.—The Workmen's Compensation Act of Oregon provides that:

" * * The term 'employer,' used in this act, shall be taken to mean any person, firm or corporation, including receiver, administrator, executor or trustee, that shall contract for and secure the right to direct and control the services of any person, and the term 'workman' shall be taken to mean any person, male or female, who shall engage to furnish his or her services subject to the direction or control of an employer. * * "    Section 6619, Or. L.

"The hazardous occupations to which this act is applicable are as follows:

"(a) Factories, mills and workshops where power-driven machinery is used. * * "    Section 6617, Or. L.

" 'Mill' means any plant * * or place where machinery is used * * ."    Section 6619, Or. L.

The litigation between the parties involves the single question submitted to the jury: "Was Jesse G. Farrin, the deceased, an employee of Parmele & Sons?"

This case is not tried here anew upon the transcript and the evidence accompanying it. The record shows that the commission decided that Farrin was not an employee of Parmele & Sons at the time of the accident in which he was killed, but upon appeal to the Circuit Court a jury, after hearing the evidence and being fully advised as to the law governing the question submitted to it for determination, unanimously found that Farrin was such employee. It is not for us to determine whether the worthy gentlemen who compose the State Industrial Accident Commission decided that question correctly or otherwise. The question before us is not whether Farrin was an employee of Parmele & Sons. The sole inquiry for us to answer is: "Was there some competent evidence adduced at the trial upon the part of the plaintiff, however slight, to sustain the verdict of the jury finding that Farrin was an employee of Parmele & Sons, the owners and operators of the sawmill?"

1. The practice governing the granting of nonsuits and directed verdicts is definitely settled in this state. From the many opinions upon this subject running through our reports, we quote the following excerpts:

"A case should be submitted to the jury unless there is an entire lack of evidence tending to main-

tain the issues on behalf of the plaintiff." *Tippin* v. *Ward,* 5 Or. 450, 453.

"The rule on this subject, as laid down by the court at the present term is, that a cause should be submitted to the jury, unless there is an entire lack of evidence to establish the issues on the part of the plaintiff." *Southwell* v. *Beezley,* 5 Or. 458, 460.

"It would have to be a case where there was a total failure of proof of some material allegation of the complaint." *Grant* v. *Baker,* 12 Or. 328, 331 (7 Pac. 318).

"The principle has often been declared that where the right determination of a cause depends upon the effect or weight to be given to the evidence, it is for the consideration of the jury under proper instructions from the court as to the law, and that a case should not be taken from the jury unless the evidence at the trial, and all reasonable inferences of which it is susceptible, are insufficient to support a verdict for the plaintiff: *Phoenix Ins. Co.* v. *Doster,* 106 U. S. 30 [27 L. Ed. 65, 1 Sup. Ct. Rep. 18]; *Randall* v. *R. R. Co.,* 109 U. S. 478 (27 L. Ed. 1003, 3 Sup. Ct. Rep. 322]." *Anderson* v. *North Pac. Lbr. Co.,* 21 Or. 281, 287 (28 Pac. 5).

"In passing upon this question we only examine the record far enough to ascertain whether or not there was some evidence on each material issue. We do not assume to weigh such evidence or to determine its sufficiency, but only that there was some evidence before the jury upon which they might find a verdict if they believed the witnesses." *Salomon* v. *Cress,* 22 Or. 177, 178 (29 Pac. 439).

"It appearing from an examination of the record in this case that there was some evidence on the part of plaintiff, however slight, to sustain the verdict, held that it was not error in the court below to deny the motion of defendant for a nonsuit." *Ryberg* v. *Portland Cable Ry. Co.* (Syl.), 22 Or. 224 (29 Pac. 614).

"Whenever a motion for nonsuit is made, every intendment and every fair and legitimate inference

which can arise from the evidence must be made in favor of the plaintiff. * *

"The question of the admissibility of the evidence is one with which in determining the point now under consideration we have nothing to do, but, assuming that the evidence was admissible for the purpose of affecting the defendant, was it of such weight that a jury might legally and properly infer from it that the plaintiff had lost any property of definite value? Before a court is authorized to grant a nonsuit for insufficiency of evidence, it must appear that, admitting the testimony of the plaintiff to be true, and giving him the benefit of every inference that is fairly deducible from it, the plaintiff has still failed to support his action. In fact, it is enough if the evidence offered tends to show facts sufficient to sustain the action, though remotely." *Herbert* v. *Dufur*, 23 Or. 462, 466, 467 (32 Pac. 302). To similar effect, see *Wallace* v. *Suburban Ry. Co.*, 26 Or. 174, 176 (37 Pac. 477, 25 L. R. A. 663).

"A motion for a nonsuit is in the nature of a demurrer to the evidence; it admits not only all that the evidence proves, but all that it tends to prove." *Brown* v. *Oregon Lbr. Co.*, 24 Or. 315, 317 (33 Pac. 557).

"The doctrine now established by precedents has come to this: The court is the exclusive judge of the competency of evidence offered to prove a fact under the issues. If competent and its tendency, however slight, is to prove such fact, the jury ought to have it, as they are the exclusive judges of its sufficiency." *Vanbebber* v. *Plunkett*, 26 Or. 562, 564, 565 (38 Pac. 707, 27 L. R. A. 811).

"That there was no direct evidence of the explicit fact of firing the goods implicating the proprietors none can gainsay. But the question here is whether there was any evidence, direct or circumstantial, sufficient to go to the jury, from which they could fairly infer the fact at issue. If so, the question was for the jury, and the court could not invade its province by directing them to bring in a certain kind of

verdict. * * It is not for us to say what we would have done if we had been sitting as jurors, but to determine whether there was any evidence competent to go to the jury and from which the jury might have drawn the inference evidenced by their verdict. Mr. Justice WOODS, in *Bayly* v. *London Ins. Co.*, 2 Fed. Cas. 1087, says: 'Even were I convinced that the proof sustained the charge, it would not be my province to set aside the verdict of the jury because I disagreed with them.' " *First Nat. Bank* v. *Fire Assn.*, 33 Or. 172, 187 (53 Pac. 8). To like effect see *Barr* v. *Rader*, 33 Or. 375, 376 (54 Pac. 210).

"The rule is well settled in this state that if there be any evidence, however slight, fairly susceptible of an inference or presumption tending to establish a material allegation of the complaint, it is the duty of the court to deny the motion for a judgment of nonsuit and submit the question involved to the jury for determination." *Perkins* v. *McCullough*, 36 Or. 146–148 (59 Pac. 182).

"If there is any competent evidence tending to support the plaintiff's case, he is entitled to have it go to the jury. It is only when there is a total absence of testimony that the court can take the case from the jury." *Morgan's Estate*, 46 Or. 233, 242 (77 Pac. 608, 78 Pac. 1029).

"And if the evidence tends to show facts which will sustain the action, though remote, the motion for nonsuit should not be sustained." *Putnam* v. *Stalker*, 50 Or. 210 (91 Pac. 363).

"The rule is that if two inferences may be legitimately drawn from the facts in evidence, one favorable and the other unfavorable to the defendant, a question is presented which calls for the opinion of the jury." *Galvin* v. *Brown & McCabe*, 53 Or. 598 (101 Pac. 671).

"On a motion for nonsuit every intendment and every fair and legitimate inference which can arise from the evidence must be made in favor of plaintiff." *Harrison* v. *Burrell*, 58 Or. 410, 422 (115 Pac. 141).

"Upon a motion for a nonsuit, every intendment and every reasonable inference must be made in favor of plaintiff, and the court must assume those facts as true which the jury can fairly find from the evidence." *Thienes* v. *Francis,* 69 Or. 165, 170 (138 Pac. 490).

"In the consideration of a motion for a nonsuit all of the testimony on the part of plaintiff is to be regarded as true, together with every intendment and reasonable inference which can arise therefrom. Considering the same in this manner, if a difference of opinion may exist as to the conclusions of fact which may be drawn from the evidence, the case should be submitted to the jury to pass upon the issues." *Watts* v. *Spokane P. & S. Ry. Co.,* 88 Or. 192, 196 (171 Pac. 901).

"A motion for nonsuit is a demurrer to the evidence and admits the truth of the evidence and every reasonable inference of fact which the jury may infer from it. And if different conclusions can be drawn from the facts, the case should be left with the jury." *Herrick* v. *Barzee,* 96 Or. 357, 371 (190 Pac. 141).

"In considering this motion, every reasonable intendment and every fair and legitimate inference which can arise from the evidence must be made in favor of the plaintiffs. It is elementary law in this state, that in passing upon defendant's motion for a directed verdict all competent evidence in the record was entitled to consideration by the court in the light most favorable to the plaintiffs. If there was sufficient competent evidence given at the trial to make a *prima facie* showing, the court was required to deny the motion." *Collins* v. *United Brokers Co.,* 99 Or. 556, 559, 560 ° (194 Pac. 458).

2. The workmen's compensation law has not enlarged the power of the courts on appeal. It says that:

"In case of any trial of fact by a jury, the court shall be bound by the decision of the jury as to the question of fact submitted to it." Section 6637,

Or. L.; *Grant* v. *State Industrial Acc. Com.*, 102 Or. 26 (201 Pac. 438); *Stark* v. *State Industrial Acc. Com.*, 103 Or. 80 (204 Pac. 151).

A compilation of many judicial utterances by eminent jurists concerning the high value to be placed upon a fact found by a jury is set down in 1 Moore on Facts, at Section 20. We quote therefrom the following:

"Judge COOLEY * * said: 'The jurors, and they alone, are to judge of the facts and weigh the evidence. The law has established this tribunal because it is believed that, from its numbers, the mode of their selection, and the fact that the jurors come from all classes of society, they are better calculated to judge of motives, weigh probabilities and take what may be called a common-sense view of a set of circumstances involving both act and intent than any single man, however pure, wise, and eminent he may be.' " *People* v. *Garbutt*, 17 Mich. 9; Moore on Facts.

" 'The jury, from their experience and knowledge of the common concerns of life, are presumed to be the best triers of fact,' said Judge SCOTT of the Missouri Supreme Court. 'They take with them into the jury-box their experience in life, which has enabled them to form the rules by which they will ascertain the weight to be given to the evidence of anyone who speaks in their sight and hearing, having due consideration of the circumstances by which he is surrounded.' " *State* v. *Schoenwald*, 31 Mo. 147, 155.

" 'Without discussing the relative merits of a fixed tribunal for the trial of facts, and the trial by jury,' said Judge PEARSON of the North Carolina Supreme Court, 'suffice it that the common law prefers the latter, and considers it safer, in the investigation of facts, to depend upon the good sense of a jury, than upon the knowledge of a judge; for the reason that juries take a common-sense view of every question, according to its peculiar circumstances, whereas a

judge generalizes and reduces everything to an artificial system formed by study.' "   *State* v. *Williams*, 2 Jones L. (47 N. C.) 257, 269.

"Mr. Justice Miller said: 'In my experience in the conference room of the Supreme Court of the United States, which consists of nine judges, I have been surprised to find how readily those judges come to an agreement upon questions of law, and how often they disagree in regard to questions of fact, which apparently are as clear as the law.' "   1 Moore on Facts, § 19.

3. The outstanding points established by the proofs are, that Farrin, the deceased, was engaged in a hazardous occupation at the time of the fatal accident; that the sawmill where he worked was the property of Parmele & Sons, situate upon their lands, and was operated by them; that in its operation the mill required a crew of four men; that Farrin was one of that crew; that Parmele & Sons were operating the mill on the 20th and 21st of November, 1919; that that sawmill, on the days mentioned, was within the terms of the Workmen's Compensation Act; that the scope of Farrin's employment about the mill began at the millpond, whence the logs were conveyed to the saw, and that he followed the logs in their course until they were cut into lumber; that he then conveyed the lumber to the trimmer, and from the trimmer to the planer.   Farrin was a workman, assisting, with his toil, in the manufacture of a finished product. There is some evidence tending to show that when he was killed he was under the complete control of the owners of the mill.   Not only was that sawmill under the provisions of the workmen's compensation law, but the workmen engaged in that mill were also within the protection of the act.   Under our compensation law, the fact that there were but a few

workmen, or that they were employed for a short time only, or that a small amount of lumber was cut each day, in no way affects the application of the law to the case in hand.

The record before us shows that Farrin was instantly killed as a result of the explosion, which threw him a great distance, inflicting wounds upon his face from flying fragments of metal. He was last seen alive just prior to the explosion, at the logging chute, which is situate a short distance from the boiler. Based upon all the surrounding circumstances, the reasonable inference concerning his immediate occupation and whereabouts at the time of the explosion is, that he was employed at the chute in assisting in the transportation of a sawlog from the pond to the saw. This conclusion is reached by an application of direct and circumstantial evidence admitted into the record.

Appellant asserts in its brief that:

"The plaintiff attempted to show that deceased was working at the sawmill and that while he was so working the boiler exploded and he was killed. With that much evidence and no more, a contract of employment could be implied. It was only on cross-examination that it was disclosed that deceased had contracted with Parmele & Sons whereby said firm was to saw deceased's logs for $6 per thousand feet, deceased to receive his lumber on the sorting table as it came from the saw, he to sort it and pile it in accordance with his own desires."

All the evidence admitted into the record made a case entitling its submission to the jury. We cannot agree with appellant that the defendant's cross-examination destroyed plaintiff's *prima facie* case. The jury decided against defendant's contention, and

the verdict was based upon competent evidence of some weight.

4. The commission, through its counsel, asserted that Farrin "having been engaged in work incidental to farming, cannot be held to be under the Compensation Act, in the absence of evidence that Parmele & Sons had made application to operate under the provisions of the act."

Section 6618, Or. L., enacts that:

"Farming and all work incidental thereto except the construction of dwelling-houses, hop dryers, fruit dryers, stock and hay barns, are nonhazardous occupations and are subject to the provisions of this act only through compliance with Section 6636."

Section 6619 reads, in part, as follows:

" 'Farming' means the cultivation of land, dairying, horticultural or viticultural labor, stock or poultry raising, and operations incidental thereto; also, when incidental thereto, threshing, clover hulling, hay baling, ensilage cutting, land clearing with or without blasting, wood sawing, wood cutting, operation of tractors, fruit dryers, feedmills and other work done with power-driven machinery, whether or not such operations are carried on by the owners of the farm or commercially, or under contract."

We cannot follow counsel. The operation of the Parmele sawmill was neither farming nor incidental to farming. True, they were cutting lumber for the purpose of constructing a dwelling-house, but the construction of dwelling-houses is subject to the provisions of the Compensation Act. However, such is not the reason that Farrin came within the terms of the act. Every workman employed in a sawmill is engaged in a hazardous employment, whether that sawmill is owned and operated by a farmer upon his

farm, or by some capitalist upon a city block. The location, the ownership, or the size of the mill, has not one thing to do with the matter of his coming within the provisions of the workmen's compensation law. The workmen's compensation law was created for the protection of all hazardous occupations therein enumerated, regardless of their extent, and for all workers in such occupations, however brief their employment. If sawmills owned and operated by farmers are to be excluded from coming under the act automatically, such exclusion must be by legislative enactment, and not by construction.

The complaint in the case at bar must of necessity be largely established by circumstantial evidence. One of the owners, the head sawyer who had charge of the mill at the time of the explosion of the boiler, was killed. A brother was called as a witness for the plaintiff. He likewise testified for the defendant.

5. An assertion is made by defendant, in substance, that by reason of the coroner's report the commission was without jurisdiction to entertain the Farrin claim, and that the judgment obtained on appeal therefrom to the Circuit Court is void because of the absence of jurisdiction. Under our Code, the coroner was powerless to determine the status of Farrin as an employee. The general duties of a coroner are provided by Chapter VII, Title XIV, and his authority and duties in holding an inquest are set down in Chapter XXIII, Title XVIII, Or. L.

6. Legal refinements and technical niceties of the law should not be invoked to withhold from a widow and child that which the law awards them. Neither the method of paying a wage, nor the fact that no pay-roll is kept, is a bar to compensation.

"The Workmen's Compensation Acts should be liberally construed so as to attain the accomplishment of their beneficent purposes. * * And doubts respecting rights to compensation should be resolved in favor of the employee or his dependents." 2 Schneider, Workmen's Compensation Law, § 576 and notes.

This thought expressed by the Supreme Court of Indiana has frequently been sanctioned:

"The Workmen's Compensation Act sought the correction of recognized errors and abuses by introducing new regulations for the advancement of the public welfare. Being remedial in character, it should be construed with regard to former laws and the defects or evils to be corrected and the remedy provided. It should be liberally construed to the end that the purpose of the legislature, by suppressing the mischiefs and advancing the remedy, be promoted, even to the inclusion of cases within the reason although outside the letter of the statute: 36 Cyc. 1175." *In re Duncan* (Ind. App.), 127 N. E. 289; 2 Schneider, Workmen's Compensation Law, § 576.

This case is affirmed.

AFFIRMED.    REHEARING DENIED.

BURNETT, C. J., and BEAN and RAND, JJ., concur.