Argued September 14; reversed October 4; rehearing denied December 6, 1932

## FENNELL *v.* HAUSER ET AL.

(14 P. (2d) 998)

*Richard Sleight,* of Portland (F. S. Sever, of Portland, on the brief), for appellants Moser, Handley, and Sweeney.

*Charles A. Hart,* of Portland (Philip Chipman and Carey, Hart, Spencer & McCulloch, all of Portland, on the brief), for Hauser and Banks.

*C. D. Christense,* of Portland (Maurice W. Seitz, of Portland, on the brief), for respondent.

BROWN, J. The defendants, appealing, assert that, in directing a verdict for the plaintiff and against the defendants, the trial court has overridden the fundamental law of this commonwealth, which reads:

"The right of trial by jury shall be preserved * * *." Or. Const., Art. 7, § 3.

See *Crawford v. Cobbs and Mitchell Co.,* 121 Or. 628, 636 (253 P. 3, 257 P. 16) ; *Farrin v. State Industrial Accident Commission,* 104 Or. 452 (205 P. 984), and citations.

■ Was there an issue of fact as to whether these defendants had, through their participation in the Norblad campaign, directly or impliedly purchased, or consented to the purchase of, the wares and merchandise for the account of the committee?

The opening statement made by defendant T. B. Handley on his own behalf, and on behalf of his codefendants, seems to be fair and candid. This statement, which was brought here by the bill of exceptions, reads, in part:

"The meeting proceeded and they organized the 'Norblad for Governor' Club or Committee of these one hundred men and women. Mr. Hauser was made chairman, and Mrs. Frankel, one of the leading women of Portland, a well known woman in club work, was made chairman of the Women's Division of that committee, Mrs. M. H. Lamond was selected as secretary of the Women's Division of that committee, and later Mr. Sam Powell was employed as the secretary, the executive or business secretary. Then a few days later they opened up headquarters at the Multnomah Hotel. * * * Thereafter, after the committee was formed and he became the chairman of it, the woman chairman and the woman secretary and the executive secretary were selected, and then Gus Moser, a defendant, Bill Banks, a defendant, Tom Sweeney, a defendant, myself, a defendant, and Senator Jay Upton later, from Eastern Oregon, all of us having had experience in politics and some of us in state-wide campaigns, formed ourselves into an advisory committee to Mr. Hauser, carrying out the representations that the governor had made to him that we would assist him in those matters. Nearly every day we met in secret session with Ken-

neth Hauser and discussed matters political, and that continued for six weeks during the campaign. * * * During the course of the campaign and at the headquarters there was much supplies ordered. It was necessary."

Concerning his selection as chairman of the committee, defendant Hauser testified:

"I was waited on by a group of men, including then Governor Al W. Norblad, and invited not only to become a member of their group, but to be chairman of the general campaign throughout the state. I said no at first. * * * I was assured by Governor Norblad there would be no financial responsibility on my part."

He testified that it was his understanding "that a finance committee, working through and with Governor Norblad, would provide the funds to take care of the legitimate expenses." Relating to the call for a meeting, he testified:

"The object of the call for a meeting to form a committee of one hundred—I guess it is customary in all political campaigns—it is more of a mass meeting, a rally meeting, with the purpose to form a committee, the so-called Committee of One Hundred, which did not mean it was necessarily limited to one hundred. If we didn't have very good luck it would be a committee of seventy-five. If we had good luck it would be a committee of one hundred fifty or two hundred."

He testified that he was chairman of the meeting.

When asked to state whether he had guaranteed the bills incurred in the Norblad campaign, he testified, in part, as follows:

"I always told every one that questioned the financial situation that if and when the money came in it would be paid out to them and distributed as fairly as we knew how to do it."

However, he testified that he did guarantee payment to "three or four—the Oregonian, the former Portland News, and two or three of them refused to take an order unless I did give them a personal letter with a personal responsibility attached to it, and I gave them that, and I have since paid it out of my personal funds. * * * My telephone rang for a year and a half after the campaign was over, and I paid some in self-defense so I could do my own business or my own work." He testified that the committee, which was sometimes styled the "Huddle Committee," and of which all of the defendants were members, met nearly every day. He further testified that the slogan, "Hats off to the past, and coats off for the future," as well as several other "good ideas," originated with Governor Norblad himself. On being asked to name other persons who were acting as political advisors to Governor Norblad, he stated that Gus Anderson, Fred Gifford, Fred Brady, and Bardi Skulason were among the most prominent.

Defendant W. W. Banks, for many years a practicing attorney in Portland, testified that he had become acquainted with Governor Norblad "years ago" when they were both in the State Senate; that when he (the governor) decided to run for reelection to the office of governor in the spring of 1930 "he asked me to assist him in his candidacy for the Republican nomination to succeed himself, and I assured him I would be very glad to do anything that I could for him." This witness testified that he, accompanied by Senator Moser, Governor Norblad and T. A. Sweeney, went to see Mr. Kenneth Hauser at the Multnomah Hotel, and that they requested Mr. Hauser to become chairman of "Norblad's efforts * * * for reelection";

that Hauser reluctantly accepted the appointment as chairman of the committee, and was assured by the governor that there would be no financial responsibility upon his part, "or upon any of us." He testified that after that time a committee of one hundred was called at the Multnomah Hotel for the purpose of forming a general committee; that, at that meeting, more than one hundred persons were present, and that Mr. Hauser acted as chairman; that Governor Norblad addressed the meeting and outlined his plans for carrying on his campaign. Witness testified that "whatever has been done by myself I did for Governor Norblad," and that "I also contributed, I think, something like a thousand dollars to his campaign fund." He testified that he at no time directly or indirectly ordered any of the goods, wares and merchandise involved in this litigation.

Defendant T. B. Handley testified in relation to his association with Governor Norblad and his political committee, and stated that he "had absolutely nothing to do with the ordering of anything."

Defendant Gus C. Moser testified that he had long been acquainted with Governor Norblad, and that he had volunteered his support to him in his effort to succeed himself; that, when witness and other defendants, accompanied by the governor, called upon Mr. Kenneth Hauser for the purpose of inducing him to become chairman and manager of the Norblad campaign, the governor there stated emphatically that Hauser would assume no financial responsibility, and that he (Governor Norblad) "would back him up on everything he did" and "would see that the thing was financed." Senator Moser testified that he "had nothing to do at all with the management or the incurring of these bills."

Defendant Sweeney also testified that Mr. Hauser accepted the chairmanship of the Norblad committee with reluctance, and that he was assured by the governor that he would not be financially responsible. This witness testified that he assisted the candidacy, but that he had nothing to do with ordering, or discussing the payment for, any of the wares mentioned in this proceeding.

On March 26, 1930, defendant Hauser, as general chairman, wrote a communication to Honorable Gus C. Moser, in which it is stated, among other things:

"It is my pleasure to invite you to become a member of the General Campaign Committee of one hundred citizens to assist in retaining Governor Norblad as Chief Executive of the State of Oregon. Governor Norblad will meet with this committee of one hundred citizens in Portland on Friday, the 28th day of March, 1930, at 8:00 P. M.  *  *  *  We believe every effort should be made by the citizens of Oregon to retain this young, progressive, constructive and dynamic personality as governor of our state, and your valuable and wholehearted co-operation and assistance will be greatly appreciated.

"Cordially yours,
"Kenneth D. Hauser,
General Chairman."

Enclosed with this communication was an admittance card to be presented at the door of the Grand Ball Room of the Multnomah Hotel on the date mentioned. The card reads:

"Governor Norblad's
General Committee Meeting.
"Please admit Gus Moser  *  *  *  Friday evening, March 28, 1930, at 8:00 P. M.

"Kenneth D. Hauser,
General Chairman."

Long after the close of the campaign, Honorable Gus Moser, by a communication bearing date September 13, 1930, wrote the attorney of the creditors, in part, as follows:

"The bills incurred aggregated a much larger sum than had been anticipated, and the amount of contributions was considerably less than was expected. * * * For the information of yourself and your clients, I beg to say that I believe that everything will be taken care of not later than December 1st * * *.

"Very truly yours,
(Signed) Gus C. Moser."

Under date of September 6, 1930, Kenneth D. Hauser, General Chairman, wrote Henry R. Hayek, of 311 Pine Street, Portland, in part, as follows:

"Undoubtededly much credit was extended to the Norblad Campaign Committee on account of my being connected with it. I have regretted ever since that this condition existed, as it would have been less embarrassing had every one insisted on cash down with an order. We did not have the money at the time, and the result would have been a large saving in printing and advertising expenses. * * * I have paid five thousand dollars of these bills with my personal note, distributing this amount among the poor fellows who could least afford to wait. * * * I am writing you at this length to acquaint you with the situation first-hand. * * *

"(Signed) Kenneth D. Hauser."

These letters reveal the financial situation that confronted the Norblad Campaign Committee. For the payment of the bills incurred the committee seems to have relied, in part at least, upon voluntary contributions. The amount that may be expended by a candidate to finance his own campaign is limited by law; and this fact should have been known, not only to the

candidate but to the members of his campaign committee, who, with one or two exceptions, are lawyers of long standing. In the light of these facts, we are of opinion that the question as to the liability of the various committeemen for the obligations incurred by the committee was for the jury to determine.

■ The law governing this action was announced by this court in *Cousin v. Taylor,* 115 Or. 472 (239 P. 96, 41 A. L. R. 750). This case was prosecuted by the plaintiff against defendants W. K. Taylor, S. S. Harrelson and fourteen others, to recover for services performed at a "rate hearing" before the Oregon Public Service Commission. Plaintiff based his right of recovery upon his alleged employment by Taylor, who, the plaintiff asserted, was acting for himself individually and as agent of the other defendants. Evidence was admitted to show that in pursuance of his authority defendant Taylor employed the plaintiff, who performed the services he had contracted to perform. When the plaintiff had concluded his testimony the trial court gave judgment of nonsuit against plaintiff as to all of the defendants except Taylor and Harrelson, and allowed the trial to proceed as to them. The defendants had verdict, and plaintiff appealed to this court, where Mr. Justice Rand, delivering the opinion for the court, wrote:

"Since this association was not a legal entity and there is no statute in this state authorizing such an organization, or defining the duties, powers and liabilities of the members of such an association when voluntarily formed, the association could neither sue nor be sued, and as such it had no capacity to enter into a contract, or to appoint an agent for any purpose. Therefore a contract entered into in the name of the association, or in its behalf, by any of the officers or members of the association would not be binding upon

the association or enforceable against it. But no such a limitation exists upon the powers and liabilities of the individual members who compose such an association. As individuals they are free to contract, and to appoint agents or committees to enter into contracts for them, and any such contract when thus entered into by such agent or committee, if within the scope of the authority conferred, is binding upon them as principals. It is true that no person can be charged upon a contract alleged to have been made upon his responsibility, unless it can be shown that to the making of that contract upon his responsibility he has given his express or implied consent. While under this principle no member of the association would be directly responsible as principal upon a contract made by Taylor unless it was first shown that to the making of the contract by Taylor such member gave his assent, expressly or impliedly, but when it was shown that any member of the association present at the meeting assented to the appointment of Taylor for the purpose of employing plaintiff, or assented to the making of the contract by Taylor, or ratified and approved the contract after it was made, then under this principle such person would be directly responsible as principal.''

Did the defendants in the instant case expressly or impliedly enter into or ratify the contract or contracts hereinbefore referred to, or ratify or approve such contracts at any time after the making thereof?

In 5 C. J., at page 1363, section 98, the author announces the doctrine relating to the rights and liabilities of an unincorporated association in the following language:

''An association not engaged in business enterprises and the objects of which do not contemplate profit or loss is not a partnership, and the liability of its members for debts contracted in behalf of the association is governed, not by the principles of partnership, but by those of agency. Membership, as such,

imposes no personal liability for the debts of the association; but to charge a member therewith it must be shown that he has actually or constructively assented to or ratified the contract upon which the liability is predicated. If, however, a member, as such, directly incurs a debt, or expressly or impliedly authorizes or ratifies the transaction in which it is incurred, he is liable as a principal. So a member is liable for any debt that is necessarily contracted to carry out the object of the association. In case members are liable, their liability is joint and several. *It is a question for the jury to determine whether credit was given to the members, and whether the members authorized or ratified the contract in suit.*"

In 7 A. L. R. at page 222, under the heading of "Personal Liability of Member of Voluntary Association not Organized for Personal Profit on Contract with Third Persons," we note the following annotation:

"It is held by the great weight of authority, that there is no implied liability of the members of a voluntary association not organized for profit on contracts of the association, and that the members are liable on the principle of actual agency only."

And from page 229 of that work we quote:

"A member of a voluntary association, not organized for profit, is not bound by any obligation incurred by or on behalf of the association without his assent or subsequent ratification."

Whether these defendants incurred liability in the several causes of action named in the complaint in this case presents an issue of fact for the determination of the jury. In our opinion, the trial court had no right to take the case from the jury; and in this lies error sufficient to reverse the case. It is so ordered.

BEAN, C. J., BELT and CAMPBELL, JJ., concur.